```
1              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
2                        SHERMAN DIVISION

3

4   IN RE:                    )   BK. NO: 07-41092-BTR-7

5                             )

6   ROBERT EDWIN JACOBSEN      )

7          D E B T O R        )

8

9

10          *   *   *   *   *   *   *   *   *   *   *

11

12                  TRANSCRIPT OF PROCEEDINGS

13

14          *   *   *   *   *   *   *   *   *   *   *

15                  Testimony of Alise Malikyar

16                      Court's Ruling

17

18

19

20          BE IT REMEMBERD, that on the 16th day of July,

21   2008, before the HONORABLE BRENDA T. RHOADES, United States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:
```

1          (The witness was sworn by the Courtroom Deputy.)

2          <u>ALISE MALIKYAR</u>

3  The witness, having been duly sworn to tell the truth,

4  testified on her oath as follow:

5          <u>DIRECT EXAMINATION</u>

6  BY MS. LINDAUER:

7     Q.   Ms. Malikyar, could you please state your full name

8  for the record.

9     A.   Alise Malikyar.

10     Q.   Okay.  And tell me a little bit about language.

11    You speak English, correct?

12     A.   I do.  I just -- I have hard time with law

13  language.

14     Q.   Okay.  Legal terms?

15     A.   Legal terms, exactly.

16     Q.   Okay.  What is your -- what is your first language?

17     A.   Farsi.

18     Q.   And so your second language is English?

19     A.   Correct.

20     Q.   Okay.  And were you born in the United States?

21     A.   No.   I was born in Afghanistan.

22     Q.   In Afghanistan, okay.

23    And how long have you lived in the United States?

24     A.   Since '82.

25     Q.   And did you come over here as an adult or as a

1  child?

2      A.   As adult.

3      Q.   All right.  Did you learn how to speak English in

4  Afghanistan?

5      A.   No.  I learned French as a second language.

6      Q.   Okay.  So did you learn English when you came to

7  the United States?

8      A.   Yes.

9      Q.   All right.  So just to be clear, sometimes you

10 don't understand all of the terminology or the words that

11 people use in this type of context, correct?

12     A.   Lots of them.

13     Q.   And, also, you are very nervous about being here;

14 is that right?

15     A.   Oh, God, yes.

16     Q.   Okay.  So if you make a mistake or you mis-speak

17 the judge understands and you can obviously correct yourself.

18 You understand that?

19     A.   Thank you.

20     Q.   Okay.

21          MS. HAMM:  Your Honor, I'm going to object.

22 I'm not sure if the witness is being set up for later on

23 saying, Well, she didn't understand the question or

24 something.  But If Ms. Malikyar cannot understand the

25 terminology in this courtroom, then they need to bring an

1 interpreter.

2          THE COURT:  The objection is overruled.

3     Ms. Malikyar, you understand if there's any question

4 you do not understand, you need to state that on the record.

5 Otherwise, we will assume you understood the question when

6 you answered.

7     You understand that?

8          THE WITNESS:  Okay.

9          THE COURT:  Thank you.  You can proceed.

10     Q.  Okay.  Ms. Malikyar, you were present when your

11 husband, Mr. Jacobsen, testified; is that right?

12     A.  Yes.

13     Q.  Okay.  And you've never testified in these

14 proceedings; is that correct?

15     A.  No.

16     Q.  And when were you and Mr. Jacobsen married?

17     A.  1999.

18     Q.  And how many years -- you've been married

19 continuously since 1999?

20     A.  Yes.

21     Q.  Now, did you and your husband enter into agreement,

22 one before you were married and one after you were married?

23     A.  Yes.

24     Q.  Okay.  And do you understand what the purpose of

25 those agreements was?

1      A.   Yes.

2      Q.   Can you tell us what your understanding of the

3 purpose of those agreements?

4      A.   Just the paper said it's just pre-nup.  So when I

5 bought the Tice Valley or any other property in my name, it

6 will be mine.  And --

7      Q.   Okay.  Go ahead.  I'm sorry.

8      A.   Not be shared.

9      Q.   Okay.  Not be shared?

10     A.   Yes.

11     Q.   Okay.  And that's your understanding.

12          Now, in particular, among the property that was listed,

13 you did list the Tice Valley property; is that correct, that

14 was one of the properties that was listed?

15     A.   Yes.

16     Q.   Okay.  Can you look with me at -- in the documents

17 you have in front of you at Exhibit B?  Do you have Exhibit

18 B?

19     A.   Okay.  What should I look for?

20     Q.   Okay.  Do you have -- do you have that in front of

21 you, Exhibit B?

22     A.   I do.

23     Q.   Look at the very last page of that document.

24     A.   Okay.

25     Q.   Do you see it says Schedule B?

1          MS. LINDAUER:  Your Honor, if I might

2    approach?  I think she might be on the wrong document.

3          THE COURT:  You may.

4          MS. LINDAUER:  Thank you.

5    A.    Thank you.

6    Q.    All right.  Do you see Schedule B?

7    A.    Yes.

8    Q.    Okay.  And is that your signature on that document?

9    A.    Yes, it is.

10   Q.    And item number 2 says, 2324 Tice Valley; do you

11   see that?

12   A.    Yes.

13   Q.    And that was listed as your separate property; do

14   you see that?

15   A.    Yes.

16   Q.    And is it your position today that that property is

17   your property?

18   A.    That's what I believe.

19   Q.    Okay.  Do you still believe that?

20   A.    Of course.

21   Q.    Okay.  If we look at the document right behind that

22   document, Exhibit C; do you see that?

23   A.    Yes.

24   Q.    That's a -- called a grant deed.

25         What is your understanding of that particular document?

1    What is that document?

2         A.    That's what make me the Trustee of the Tice Valley

3    house.

4         Q.    Does that make you also the owner of the Tice

5    Valley house?

6         A.    Yes.

7         Q.    And that was the -- and was your husband listed as

8    an owner of that property?

9         A.    No.

10        Q.    Has your husband ever been an owner of that

11   property?

12        A.    No.

13        Q.    Do you claim that property, Ms. Malikyar, as your

14   homestead property?

15        A.    I do.

16        Q.    Okay.  Do you have any other property you claim as

17   homestead?

18        A.    Not at this time.

19        Q.    Okay.  Have you ever claimed any property in Texas

20   as your homestead?

21        A.    I did.

22        Q.    Okay.  When was that?  Do you recall?

23        A.    After we were -- after we were sailing, I was

24   coming and going to find some properties all in Texas.

25        Q.    Okay.  Do you still claim that property as your

1  homestead?

2     A.   I guess they took it away from us.

3     Q.   Okay.  But it's not your homestead?

4     A.   No.

5     Q.   Okay.  Do you understand when I use the word

6  "homestead", what that means?

7     A.   Yes.

8     Q.   Okay.  You do understand that term?

9     A.   Yes, I do.

10    Q.   Okay.  All right.  And the taxes on this property,

11 the Tice Valley property, are computed based on a homestead

12 exemption to owner which is you.

13       Do you understand that, that you have that exemption on

14 this property?  Do you understand what that means?

15    A.   Yes, I do.

16    Q.   You do understand that, good.

17       As we sit here today, is there any other real estate in

18 the world that you claim as homestead, other than the Tice

19 Valley property?

20    A.   No.

21    Q.   Okay.  Now, is it your intention if the Davis' are

22 required ot move out of that property, that you and your

23 husband would move back into that property?

24    A.   Yes.

25    Q.   And you would like to have that property back; is

1  that correct?

2      A.   Yes, I do.

3      Q.   Okay.  Do you consent to your property being sold,

4  agree to it being sold, the Tice Valley property?

5      A.   The Tice Valley at the right price, yes.

6      Q.   So at the right price, you would agree to release

7  any interest you have in that house?

8      A.   Yes.

9      Q.   Okay.  Do you know what the right price is?

10     A.   What my husband said.  What the first contract was.

11     Q.   About 1.3 million, 1.290 million?

12     A.   Yes.

13     Q.   Okay.  For that amount of money you would release

14  any claim you have to that property?

15     A.   I do.

16     Q.   Okay.  But not for a million dollars?

17     A.   No.

18     Q.   And can you tell me why you wouldn't release the

19  claim for a million dollars?

20     A.   It's just not fair price.

21     Q.   Okay.

22     A.   I went with Robert and look around at the houses

23  for the comp.  That's not the right price at all.

24     Q.   Okay.  Do you think the Davis' are trying to get

25  basically a good deal

1     A.    Of course

2     Q.    Okay.  Now, Ms. Malikyar, who is liable or

3  responsible for the debts on this house?

4     A.    I -- I was.

5     Q.    You were.

6        And you are not in any bankruptcy proceeding, correct?

7     A.    I don't want to be.

8     Q.    Okay.  You've seen what's happened to your husband

9  and that doesn't look very appealing.

10       You're liable to GreenPoint Mortgage; is that correct?

11    A.    Yes.

12    Q.    Okay.  For about $770,000?

13    A.    Yes.

14    Q.    Okay.  You're liable to Coast Capital for

15  approximately $200,000; is that correct?

16    A.    I'm not exactly how much, but it's around that

17  much.

18    Q.    Okay.  And you're liable to Wells Fargo Bank for

19  roughly $250,000?

20    A.    Yes.

21    Q.    Now, if the property is sold by the Trustee or the

22  Courts, do you have any agreement with any of those lenders

23  that they will not come after you for a difference?

24    A.    No.

25    Q.    Okay.  So as far as you know, they could still come

1   after you for a difference?

2       A.   That's -- yes.

3       Q.   Okay.  You have nothing in writing from any of

4   them?

5       A.   No, I don't.

6       Q.   Okay.  Now, let's talk a minute about Coast

7   Capital.

8        Do you remember that particular creditor?

9       A.   If it's presented to me and I review it.

10      Q.   Okay.  Let's go back for a second.

11       The second lien on the Tice Valley house is held by an

12   entity called Coast Capital.  That was the original entity.

13       You understand that?

14      A.   Yes.

15      Q.   Okay.  And I believe the Trustee introduced as an

16   exhibit the objection to South Shore Capital as an exhibit.

17           MS. LINDAUER:  And, Your Honor, if I might

18   approach the witness?

19           THE COURT:  You may.

20      Q.   Ms. Malikyar, I handed you what's been previously

21   marked as the objection by South Coast Capital.  I think it's

22   now called South Creek something.  But in any event, do you

23   see that there is a note attached to that particular

24   objection that I just handed you?  See where it says "note"?

25      A.   Yes.

1    Q.    Okay.  And is your signature on that note?

2    A.    Yes, it is.

3    Q.    Okay.  And do you know how much the original amount

4  of that note was for?

5    A.    It was -- I'm not sure exactly, but it was close to

6  200,000.

7    Q.    Okay.  If you look on the first page, does it tell

8  you how much the note was originally?

9    A.    Yes.

10    Q.    And how much was the note originally?

11    A.    It was 550,000.

12    Q.    550,000?

13    A.    Yes.

14    Q.    Okay.  And your understanding is today it may be

15  closer to 200,000; is that right?

16    A.    Yes.

17    Q.    Okay.  Do you know if any money changed hands in

18  exchange for that note, for you signing that note?  Did

19  anybody receive any money when you signed that note?

20    A.    I'm not sure how to --

21    Q.    Can you explain what you do know, what your

22  understanding is?

23    A.    As far as (indecipherable word), no one received

24  the money.

25    Q.    But wasn't the money applied as a credit?  Do you

1   recall that?

2       A.   Yes.  Yes.

3       Q.   Okay.  Explain to me what your understanding of

4   that transaction was.

5       A.   It was secure -- Coast Capital put it on secured

6   Tice Valley house and the boat and Tahoe lot.

7       Q.   Okay.

8       A.   And then they were -- the way it explained to me,

9   it was not value on any of it.  It's like whatever got sold,

10  they will get the credit.

11      Q.   Okay.

12      A.   So that's the real (indecipherable word).

13      Q.   Okay.  As we sit here today, are the Tahoe lots

14  sold, to the best of your knowledge?

15      A.   Yes.

16      Q.   Has the boat been sold?

17      A.   Yes.

18      Q.   Okay.  So those credits have been applied and your

19  understanding is what, how much is still owed to Coast

20  Capital?

21      A.   200.

22      Q.   Okay.  Are you disputing that you owe that amount

23  to Coast Capital?

24      A.   I do.

25      Q.   Okay.  How much do you think you owe them>

1       A.    200.

2       Q.    Okay.  So you don't dispute that that amount is

3   still owed?

4       A.    It's still owed.

5       Q.    Okay.  Do you understand that Coast Capital has a

6   lien on the Tice Valley house?

7       A.    Yes.

8       Q.    Now, when your husband proposed a sale of that

9   property, he was proposing that that lien be paid; do you

10  understand that?

11      A.    Yes.

12      Q.    Okay.  If that lien is not paid, are you -- is it

13  your understanding that you're still responsible for that

14  debt?

15      A.    Yes.

16      Q.    Ms. Malikyar, have you seen anything in writing

17  from any of the mortgage companies or the banks saying that

18  if this sale goes through, that you will be released?

19      A.    No.  Not yet.

20      Q.    Okay.  Now, have you and your husband made an offer

21  to the Trustee to re-acquire this property or to buy this

22  property?

23      A.    Yes.

24      Q.    Okay.  And you feel that that's a competitive

25  offer; is that correct?

1      A.    Yes.  I think it's going to be the best.

2      Q.    Okay.  And you would be responsible for taking care

3  of al of the liens under that proposal; is that right?

4      A.    Yes.

5      Q.    Okay.  And your offer would then be $20,000 and you

6  would be responsible for the liens?

7      A.    Yes.

8      Q.    That you're already responsible for?

9      A.    Yes.

10     Q.    And you would like to keep the Tice Valley

11  property; is that correct?

12     A.    I do.

13           MS. LINDAUER:  Your Honor, I'll pass the

14  witness.

15           <u>CROSS-EXAMINATION</u>

16  BY MS. HAMM:

17     Q.    Ms. Malikyar, did I pronounce that right?

18     A.    Close enough.

19     Q.    Okay.  I'm sorry, I think that might be the best I

20  can do.

21     A.    Thank you.

22     Q.    Now, you said that you want the house, you want to

23  live in the house again?

24     A.    Yes.

25     Q.    But that you would also sell the house if you were

1  happy with the price, right?

2      A.   Yes.

3      Q.   And didn't your husband say earlier that you all

4  had been talking to Stacey Adams about people that are

5  interested in purchasing this property?

6      A.   Well, if they do.  That's the whole thing.  So if

7  it sells for better price, I get some money and I can live

8  on, pay my debt.

9      Q.   Okay.  And when you say that you think that you're

10 liable to GreenPoint and to Wells Fargo and to Coast Capital,

11 are you basing that on a legal opinion from somebody?

12     A.   Well, if I'm not liable, who else is?

13     Q.   Okay.

14     A.   I am liable.

15     Q.   You believe that you're liable because you signed

16 on the note, right?

17     A.   Note?  I'm sorry.

18     Q.   You believe that you're liable because you signed

19 the loan documents, right?

20     A.   Yes.

21     Q.   Okay.

22     A.   The loan, it's in my name.

23     Q.   So it's your understanding that you would be liable

24 even if the property was community property and the

25 bankruptcy estate sold it?

1    A.   It's not community property.

2    Q.   But I'm asking you an if question.

3    A.   I don't know how to answer that.

4    Q.   Okay.  All right.  Okay.  So you said that you

5 would sell the property if you could get the price that you

6 had before with the Davis', right?

7    A.   Yeah.

8    Q.   1.29.

9    Okay.  So you would pay 770 to GreenPoint, right?

10 Correct, you would pay 770 to GreenPoint?

11    A.   Uh-huh.

12    Q.   And then 200 to Coast Capital; is that right?

13    A.   Somewhere.

14    Q.   Somewhere around there.

15    250 to Wells Fargo?

16    A.   Uh-huh.

17    Q.   So we're already up to 1.23 million; is that right?

18    A.   I'm not sure.  I'm not adding.  If you're adding,

19 that's --

20    Q.   Well, I'm not very good at adding, Ms. Malikyar.

21    And then you'd have to pay like a brokerage fee of

22 probably around 72,000, right?  That would be 6 percent.

23    A.   Brokerage fee?

24    Q.   Yes, ma'am.

25    A.   I'm not sure.  What is that?

1        Q.    Would you be paying a broker?

2        A.    I'm not sure.  I don't know how to add it.  I have

3   no idea.

4        Q.    You don't know if you would pay a broker?

5        A.    I want to get the house and that's going to be my

6   house.  And later on if I want to sell it, I want to sell it.

7   It's my house.

8        Q.    Okay.  I'm not asking you if it's your house right

9   now.  I'm trying to figure out the math here because you're

10  saying you'd sell it for 1.29 because that would get you some

11  money to live on.

12        How would that get you money to live on if you had to

13  pay all of that money out to pay GreenPoint and Wells Fargo

14  and Coast Capital, plus accrued interest, plus the cost of an

15  agent, the broker, plus closing costs and real estate taxes?

16  How would you have money to live on?

17       A.    I don't know how to answer that.  I have no idea.

18       Q.    Okay.  Now, you testified that you -- I don't

19  remember if it was you or your husband, I'm sorry.  But

20  someone testified that you made some payments to GreenPoint

21  after he filed for bankruptcy?

22       A.    Yes, I believe.  I can't recall.  But I don't have

23  my paycheck with me.  I mean my checkbook with me.

24       Q.    Have you made payments to Coast Capital?

25       A.    I am not sure.  I need to have my checkbook with

1   me.

2       Q.   Do you remember the last time a payment was made to

3   Coast Capital?

4       A.   I need to check my paperwork.

5       Q.   Could you give me an estimate?  Like was it this

6   year?  Was it two years ago?  Five years ago?

7       A.   It would be unclear if I do so

8       Q.   Okay.  Have you ever made a payment to them?

9       A.   I'm sure, yes.

10      Q.   You're sure but -- you're sure that you made a

11  payment?  Do you remember making a payment?  Do you actually

12  have a specific memory of making any payment at all to Coast

13  Capital ever?

14      A.   Coast Capital payment.  I have -- I can't recall.

15  I just need to have my checkbook with me.

16      Q.   Okay.

17              MS. HAMM:  That's all, Your Honor.

18              THE COURT:  Mr. Lewis?

19              MR. LEWIS:  We could be here all day, Your

20  Honor, but I'm not.  I'm going to make this very quick.

21              <u>CROSS-EXAMINATION</u>

22  BY MR. LEWIS:

23      Q.   Ms. Malikyar, when did you first learn that the

24  Coast Capital note had been sold to South Shore Capital?

25      A.   I don't know.  I do not have knowledge of it.

1      Q.    You have no knowledge of that note having been

2  sold?

3      A.    No, I do.  But I don't know when.

4      Q.    Did you go to the foreclosure sale that Coast

5  Capital had scheduled and tried to hold for the Tice Valley

6  property?

7      A.    I didn't.

8      Q.    When did you first get a foreclosure notice from

9  Coast Capital for that property?

10      A.    I'm not sure.  I tried to -- Robert help me with

11  all those things, so I'm not sure.

12      Q.    Okay.  I understand.

13       Where did you send your payments to Coast Capital?

14  What was the -- who -- what address did you send it to?

15      A.    I don't have the address with me.

16      Q.    Do you have an approximate -- which city?

17      A.    I don't have it with me.  I'm not good at

18  remembering.  I'm sorry.

19      Q.    Do you know what state you sent it to?

20      A.    Like I said, I don't remember any of it.  I don't

21  even remember where I sent to GreenPoint or any of it.

22      Q.    Okay.  Now, did your husband, Mr. Jacobsen, consult

23  with you last summer about going forward with the sale of

24  Tice Valley to the Davis' after his bankruptcy?

25      A.    I don't remember after or before.  That's why if I

1     say, yes or not, it's not going to be right.

2        Q.   Okay.  Did you -- did he ever tell you that I have

3     filed a motion with the Bankruptcy Court in Texas so that we

4     can close that sale?

5        A.   I don't recall.  I'm sorry.

6        Q.   Did you -- do you understand that had that sale

7     proceeded, the Davis' would have paid the $1.299 million that

8     you say is a good price?

9        A.   At that time?

10       Q.   Yes.

11       A.   It was right price.

12       Q.   And you supported that sale last summer, didn't

13     you?

14       A.   Last summer, which --

15       Q.   August.

16       A.   Close to that closing time?

17       Q.   Yes.

18       A.   Before the  lien was on it, yes, I did.

19       Q.   Okay.  Then why did you agree to take the sale off

20     the market?

21       A.   When did I do that?

22       Q.   Well, let me rephrase it.

23       Why did you agree not to go forward with the motion in

24     this court to sell the property for a price that you thought

25     was good?

1      A.   I don't know about that motion.

2      Q.   You don't know anything about a motion to sell your

3  property?

4      A.   I don't recall right now.

5      Q.   Did your husband ever talk to you about, I need --

6  we need to drop this motion because I'm doing this project in

7  Costa Rica?

8      A.   If he consulted me, I trust him so I probably said,

9  yes.

10      Q.   Okay.  Who makes all of the decisions regarding the

11  Tice Valley property?

12      A.   I do as far as it's my house.  But when it come to

13  legal advice, I have no idea so he is helping me.

14      Q.   Okay.  Now, who found the property when it was

15  first bought, first acquired back in 2001, 2002?

16      A.   I was driving around and that wasn't even in

17  market.  It was open house.  I walk in there and just -- just

18  it was amazing place.

19      Q.   And who negotiated with the buyers (sic) for that

20  house?

21      A.   That was done with me.

22      Q.   What was the name of the sellers?  Who did you buy

23  the property from?

24      A.   I think two lady was on it.  I don't recall their

25  names.  Sorry.

1      Q.    How much did you pay for it?

2      A.    I think it's -- it's -- I'm not positive but I

3  think we negotiated to 720.  I remember that clearly.

4      Q.    So you negotiated, or did Mr. Jacobsen negotiate

5  the 720?

6      A.    I don't know much about real estate, so I want him

7  to help me.

8      Q.    Okay.  So you think you paid $720,000?

9      A.    Yes.

10      Q.    And who did you borrow the money from to close?

11      A.    I had some money.

12      Q.    Okay.  How much money of your money did you put in

13  to buy that property?

14      A.    I am not sure.  I have to check my paperwork.  It's

15  been long time.

16      Q.    How much did Mr. Jacobsen put in to help you buy

17  the property?

18      A.    The same thing.  I have to -- I can just bring the

19  paperwork some time.

20      Q.    And what was the name of the first mortgage company

21  that you borrowed money from the buy the Tice Valley

22  property?

23      A.    Sorry, I don't remember.

24      Q.    What was the purpose of borrowing money from Wells

25  Fargo and putting a lien on this property?

1      A.   I at first -- after a year or a year and half I

2   took -- I put the loan because he loaned me some money and I

3   need to give it back.  And that's what I did.  But I'm not

4   sure.  That was the first loan.  I paid it off and refinanced

5   the house.

6      Q.   So how much did you borrow from Wells Fargo to

7   repay your husband?

8      A.   I -- as far as I remember, at first it was 100 and

9   then it was 100,000 the first time.

10      Q.   And what was the second time?

11      A.   I think I did like a few times.  I don't remember.

12   I have to have the paperwork to be correct.

13      Q.   And what did you use the -- why did you borrow

14   money from Coast Capital and put a lien on Tice Valley?

15      A.   Because need the money.

16      Q.   What were you going to do with the money?

17      A.   Well, we are into these debt.

18      Q.   Well, I mean, you own the property and you

19   contacted Coast Capital and said, I want to borrow some

20   money, right?

21      A.   Uh-huh.

22      Q.   And, in fact, you borrowed about $900,000, didn't

23   you, from Coast Capital?

24      A.   That was -- I didn't.

25      Q.   Well, who borrowed the money from Coast Capital

1 then?

2      A.   I don't know.  I didn't borrow 900,000.

3      Q.   How much did you borrow from Coast Capital?

4      A.   It was -- I'm not sure.  I think it was 1.2

5 million, not 900.

6      Q.   Oh.  So you borrowed 1.2 million.

7           What did you do with the money?

8      A.   What did I do with the money?

9      Q.   Correct.

10      A.   We paid off some of the -- I loaned it to Robert,

11 actually and he paid his debts because it was due.  And I

12 secure all of the property with that debt I took -- I mean,

13 the loan.

14      Q.   Let me be sure.  You've now talked about two loans

15 to Robert, right?

16      A.   I'm not sure which one --

17      Q.   Now, there was a loan that Mr. Jacobsen gave you

18 from his own money to help you buy Tice Valley, right?

19      A.   That was ages ago.  That was gone, long gone.

20      Q.   And you paid that loan off by borrowing from Wells

21 Fargo, right?  Isn't that what you borrowed from Wells Fargo?

22      A.   Yes.  That was probably like seven years ago.

23      Q.   And then you borrowed some money from Coast

24 Capital, about 1.2 million and used some of that money to

25 repay Robert some other loans?

1       A.    Right now I'm really confused.  Sorry.

2       Q.    I'm sorry.  I don't mean to confuse  you.  I'm just

3    trying to figure out how many loans from Mr. Jacobsen you've

4    gotten over all of these years.

5       A.    He didn't -- I didn't get loan from him.  I just

6    got the loan from Coast Capital to secure -- that's secured

7    by all this other things I had.

8       Q.    And what did you do with the money?  Did you give

9    it to Mr. Jacobsen?

10      A.    Well, he had to pay his loan.  He took a loan and

11   it was due, so I took the loan to give it to him.

12      Q.    Okay.  So I understand that.  You borrowed money

13   from Coast Capital using Tice Valley as collateral.

14      A.    Uh-huh.

15      Q.    With me, understand?

16       And then you took that money and you gave it to

17   Mr. Jacobsen, correct, the Coast Capital loan proceeds?

18      A.    Not just Tice Valley.  It wasn't just Tice Valley.

19      Q.    That's the Tahoe lots, as well, right?

20      A.    It was, yeah.

21      Q.    And then Mr. Jacobsen took money from your

22   property, from your house, the loan on your house and he paid

23   off his personal debts with it?

24      A.    Personal debt?  It was due, yes.

25      Q.    All right.  Now, the debt that he paid off using

1 part of the proceeds of Coast Capital, you weren't liable on

2 that debt, were you?

3     A.    I am not following you, sorry.

4     Q.    Okay.  The debt that he paid off, you didn't have

5 any liability on that debt, did you?

6     A.    No, I didn't.

7     Q.    But, yet, you took property that yo owned in your

8 name, borrowed money against it, and gave your husband the

9 proceeds of that loan so that he could pay off a debt that

10 you didn't have liability on; is that what happened?

11     A.    He help me, I help him.

12     Q.    Okay.  And what's the name of the loan officer that

13 you dealt with at Coast Capital?

14     A.    I don't remember.

15          MR. LEWIS:  I'll pass the witness, Your Honor.

16

17          (no omission)

18          <u>REDIRECT EXAMINATION</u>BY MS. LINDAUER:

19     Q.    Ms. Malikyar, let me ask again, you are not in

20 bankruptcy; is that correct?

21     A.    No, I'm not.

22     Q.    And the debt that you're referring to that your

23 husband had incurred, whether you were liable or not, that

24 was a debt of your family, right?

25     A.    Yes.

 1     Q.   And you felt it was important to take care of that

 2 debt, right?

 3     A.   Exactly.

 4     Q.   And as a result of that, there is still a lien on

 5 the Tice Valley house to Coast Capital, correct?

 6     A.   Yes.

 7     Q.   And whether there here or not, Coastal Capital

 8 filed an objection to the sale.

 9      You understand that?

10     A.   Yes.

11     Q.   As to the Court selling this property?

12      Ms. Malikyar, you claim that this is your separate

13 homestead property, correct?

14     A.   I do.

15     Q.   All right.  And you have told the Court that

16 because of litigation and things, you'd be willing to have

17 the property sold irrespective of that, if it was for enough

18 money; is that right?

19     A.   Yes.

20     Q.   You want your debts paid off, correct?

21     A.   I do.

22     Q.   All of them?

23     A.   I do.

24     Q.   Okay.  And if there's any money left, you would

25 like that money, correct?

1      A.   Certainly, yes.

2           MS. LINDAUER:  Your Honor, no further

3  questions.

4           THE COURT:  Thank you.  The witness may step

5  down.

6                *   *   *   *   *   *

7           THE COURT:  All right.  Section 363(b) of the

8  Bankruptcy Code allows a Trustee to sell property of the

9  estate outside the debtor's ordinary course of business after

10  notice and hearing.  Insistent within that statutory grant of

11  authority is the requirement that the estate actually have an

12  interest in the property to be sold.  In the case before the

13  Court, the issue of whether the property is property of the

14  estate is a subject of dispute.  And for that reason, I'm not

15  going to approve the 363(b) sale because it purports to

16  transfer title to the Tice Valley property, not simply the

17  debtor's interest in the Tice Valley property.

18       And among other cases, I would cite to the parties

19  Anderson versus Kornin, in re:  Robertson, 203 F.3d 855 at

20  863, 5th Circuit, 2000.

21       As to the issues related to scheduling on the adversary

22  proceeding.  I think based on what's happened before the

23  Court today, the Court agrees that we need to have a prompt

24  decision with respect to the adversary proceedings on the

25  community property issues and the issue of the -- Ms.

1   Malikyar's interest in the property.  So let's set a status

2   conference in all of those adversaries for July 22nd at 10

3   a.m.

4        The parties will appear at the status conference with

5   information for the Court as to what further discovery needs

6   to be conducted prior to trial.  And my courtroom deputy will

7   have some potential trial dates for the parties, bases on how

8   much additional discovery needs to be had by the parties.

9        Notice of the status conference shall be sent to all

10  parties in interest.  Mr. Levick, you'll handle the notice,

11  okay?

12       And at that hearing, Ms. Lindauer, you will also

13  present to the Court arguments about why you don't have a

14  conflict of interest as to your representation of both

15  parties.  Because I am concerned that there is a conflict,

16  but I'm willing to hear why there isn't one.  Okay?

17       All right.  Thank you.  Ms. Lindauer, you'll present

18  the order to the Court consistent with the Court's ruling on

19  the motion today.  That order is due within ten days.

20       And we stand adjourned.).

21                 (End of Excerpt of Transcript.)

22

23

24

25

1              <u>C E R T I F I C A T E</u>

2          I, CINDY SUMNER, do hereby certify that the

3    foregoing constitutes a full, true and complete transcription

4    of the proceedings as heretofore set forth in the

5    above-captioned and numbered cause in typewriting before me.

6

7

8

9

10

11

12

13

14                              /s/Cindy Sumner
                            _____
15                              CINDY SUMNER, CSR #5832
                                Expires 12-31-09
16                              National Court Reporters
                                16 Gettysburg Lane
17                              Richardson, Texas 75080
                                214 651-8393
18                              Firm #417

19

20

21

22

23

24

25