1          IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                     SHERMAN DIVISION

3

4   IN RE:                    )   BK. NO: 07-41092-BTR-7

5                             )

6   ROBERT EDWIN JACOBSEN      )

7          D E B T O R        )

8

9

10              *   *   *   *   *   *   *   *   *   *   *

11

12              TRANSCRIPT OF PROCEEDINGS

13

14              *   *   *   *   *   *   *   *   *   *   *

15

16

17

18

19

20          BE IT REMEMBERD, that on the 21st day of April,

21   2009, before the HONORABLE ROBERT C. McGUIRE, united States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:

1                       <u>I N D E X</u>

2                                                          <u>PAGE</u>

3  Exhibit Index                                          3

4  <u>ROBERT JACOBSEN</u>

5       CROSS-EXAMINATION
             BY:  Mr. Lewis                               32
6             BY:  Mr. Levick                             43

7  <u>MICHAEL CRANE</u>

8       DIRECT EXAMINATION
             BY:  Mr. Levick                              62
9       CROSS-EXAMINATION
             BY:  Mr. Jacobsen                            67
10

   <u>LARRY LEVICK</u>
11
        DIRECT EXAMINATION
12             BY:  Mr. Levick                            80

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1               E X H I B I T   I N D E X

 2                                    PAGE FIRST REFERENCED

 3   Exhibit Number 1                        11

 4   Jacobsen Exhibit Number 1               29

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

1                    P R O C E E D I N G S

2                    COURTROOM DEPUTY:  Page 14, number 23, Robert

3    Jacobsen.  Case 07-41092.  Motion to require Chapter 7

4    Trustee to abandon property and another motion to require

5    Chapter 7 Trustee to abandon real property.

6                    THE COURT:  You may proceed.

7                    MR. LEVICK:  Your Honor, if I may, it's Larry

8    Levick for the Chapter 7 Trustee, Christopher Moser.

9                    THE COURT:  All right.

10                   MR. LEWIS:  Your Honor, John Lewis on behalf

11   of John and Bernadette Sramek, the two largest creditors in

12   the case.

13                   THE COURT:  All right.

14                   MR. JACOBSEN:  And I'm Robert Jacobsen, the

15   debtor.

16                   MR. LEVICK:  It's a little difficult to figure

17   out exactly what some of the relief requested and the motions

18   are a little bit similar.  But for Mr. Lewis' schedules,

19   schedules purposes, he's really here for the Tice Valley

20   hearing.  And I think that's what Ms. Malikyar is on the

21   phone for is the Tice Valley hearing.  So I thought that we

22   might take that first?

23                   THE COURT:  Any problem with that?

24                   MR. JACOBSEN:  No, that will be fine.

25                   THE COURT:  All right.  You may proceed, then.

1          MR. JACOBSEN:  Your Honor, the Tice Valley

2   property -- let me give you a little bit of background

3   because you may be a little bit new to this.

4          I filed bankruptcy myself not with my wife.  My wife

5   owned a house in Tice Valley as her sole and separate

6   property.  I filed my schedules.  I amended my schedules.  I

7   showed no homestead at all on my amended schedules.

8          My wife, on the other hand, does homestead her house

9   which I showed as an exhibit, the last -- Exhibit A on my

10  motion showing tax records where it's homesteaded.  I could

11  not claim a homestead on that house because at the time I

12  didn't consider it to be my house, but it has always been

13  homesteaded by her.  She bought it in 2001, I believe.  And

14  it's never been rented out.

15         When I flied bankruptcy, in the process of going

16  through it, we came to a stipulated agreement that we would

17  consider our property community property rather than go ahead

18  with hearing -- trial on another matter.  And so the property

19  became community property at that time.  But the house has

20  always been homesteaded in her name.  And as such, it's

21  protected.

22         THE COURT:  Now, are you an attorney, sir?

23         MR. JACOBSEN:  No, I'm not.  I'm trying my

24  best, Your Honor.

25         But it's always been homesteaded as her home.  She put

1   it on the market to sell it.  The Court stopped the sale.

2   And the prospective buyers actually moved in and rented --

3   rent before close type of business, which has been dragging

4   on until now.

5         That's pretty much it.

6                    THE COURT:  All right.

7                    MR. LEVICK:  Good morning, Your Honor.

8                    THE COURT:  Good morning.

9                    MR. LEVICK:  I'll give you my little take on

10  the background of this case.  It's been a very difficult and

11  contentious case for the Trustee.

12        Mr. Jacobsen filed a Chapter 13 petition almost two

13  years ago in this court.  He immediately in that case filed a

14  motion to sell the Tice Valley property for 1.290 million to

15  the current tenants, the Davis'.  I know he said earlier in

16  his opening or his -- that the property has never been rented

17  out, but the Davis' have lived there for years.  They

18  testified in this court about living there and they've been

19  paying rent since they've been living there.  And they're

20  still living there as tenants.

21        Any way --

22                    THE COURT:  Who are they paying rent to?

23                    MR. LEVICK:  They're paying the rent to the

24  Trustee.

25                    THE COURT:  Okay.

1           MR. LEVICK:  And, Your Honor, the property is

2    encumbered by three liens.  The first lien is the lien of

3    Greenpoint, which is now Bank of America.  And the

4    approximate amount of that lien is $800,000.  The second lien

5    was an alleged Belizean company called Coast Capital.  And it

6    was owed about $200,000.  And then there was a third lien

7    from Wells Fargo which was owed $350,000, Your Honor.

8        When Mr. Jacobsen tried to sell this property --

9           THE COURT:  I'm sorry, what was the amount of

10   their lien?

11          MR. LEVICK:  Wells Fargo, 350,000.  Now, I

12   know it looks a little shaky on the equity side here, but by

13   the end of my presentation you will see that there is much

14   equity in this property for the Trustee, Your Honor.

15       Mr. Jacobsen tried to sell this property in the 13 to

16   the Davis' for 1.29 million.  Everyone was on board with

17   this; the Chapter 13 Trustee, Mr. Jacobsen, Mr. Lewis who

18   represents the largest creditor in this case, the Srameks,

19   who have an allowed claim in this case for over 1.7 million.

20   All they wanted to have happen at this closing was to have

21   money escrowed for the second lien holder, Coast Capital.

22   It's a little interesting, to say the least, to have a second

23   lien holder be a Belizean corporation who hasn't made an

24   appearance in the case whose documents look a little

25   questionable, at best, to just pay them outright unless they

1 can get their lien proved up.  So the idea would be, just

2 like we've done in a million bankruptcies; get the sale done,

3 escrow the money, fight about it later.

4        Well, when Mr. Jacobsen learned that the second lien

5 holder couldn't be paid at closing, he withdrew the motion to

6 sell.  Now, he was filing the motion to sale, even though

7 later he claimed it wasn't his property, but somehow he filed

8 it.  So that sale fell through because Mr. Jacobsen withdrew

9 it, even though that would have brought in a lot of money for

10 the estate and the money could have been escrowed for Coast

11 Capital to come in if they had a good valid lien to try to

12 prove it up.  but it was sort of interesting because I've

13 never -- I mean, I've never heard of the debtor killing the

14 sale for such a reason.  It just leads to all sorts of

15 questions about the relationship Mr. Jacobsen must have had

16 with Coast Capital, which comes into play later in the case.

17        So then Mr. Jacobsen moved to dismiss his case in the

18 fall of that year.  Mr. Lewis objected.  There was an

19 evidentiary hearing.  And Judge Rhoades found that

20 Mr. Jacobsen had been acting in bad faith in his bankruptcy.

21 And because of his bad faith, she converted the case to

22 Chapter 7 in the fall of that year.  And Mr. Moser was

23 appointed the Chapter 7 Trustee.  Mr. Moser hired our firm.

24        Later on, among all the issues in the case, we

25 attempted and filed another motion to sell to the Davis'

again.  The economy was a little bit different when we were

trying to sell it to them.  The Davis' had certain

information and comps.  And we filed the motion to sell it to

the Davis' for 1.50 million with the Davis' picking up all of

the closing costs, all of the commissions, all of the real

estate taxes, and any and all closing costs that were there.

And we had a big hearing about a year ago on this, Your

Honor.  It was last June.

        And sure enough, Ms. Malikyar objects.  And her

objection is very interesting to us.  She says, Wait a

second.  I own that property.  Despite the fact that my

husband put it on the bankruptcy schedules under penalty of

perjury.  I own that property.  Despite the fact that he

tried to sell it before as his own in the Chapter 13, I own

the property.  And the reason I own that property is I have a

post-nuptial agreement I executed with my husband on

September 11th, 2001.  A post-nuptial agreement that's not

recorded in any deed records and a post-nuptial agreement

that's not notarized in any way.

        So -- also, at this hearing an entity claiming to be

the assignee of Coast Capital called South Shore Capital

claiming to be the second lien holder through a document that

is forged -- obviously forged on its face files an objection

to the sale.  They don't show up at the hearing.  And later

on Judge Rhoades issues an order to show cause to Robert

1   Jacobsen and to South Shore Capital to come into this court

2   and explain how such an objection should be filed because it

3   looks like Robert Jacobsen was behind the filing of the

4   second lien holder's objection.

5       Now, Your Honor, I had worked out a deal at the end of

6   that hearing.  We could pay the first in full.  The second

7   lien, if it's good, we would escrow the monies.  The third

8   lien holder, Wells Fargo, agreed to take $10,000 being in a

9   third lien position on a house in California.  And we had it

10  all worked out.  The estate would net some significant

11  monies.  Again, inexplicably the second lien holder didn't

12  like the idea that they would have money escrowed in full for

13  them and they objected, or maybe Jacobsen orchestrated the

14  objection.  It just didn't make sense.

15      Jacobsen's objection -- Mr. Jacobsen's objection at the

16  time was we weren't getting enough money.  The property is

17  worth a lot more money.  But what the judge ultimately found

18  is, and she stated on the record, she did not understand why

19  the objecting parties did not consent to this sale.  That she

20  was troubled by the fact that there is now this post-nuptial

21  agreement where Ms. Malikyar is claiming she owns it.  And if

22  she owns it as her separate property, how could the Trustee

23  sell it.  So we the Trustee need to get the title issue and

24  bring it to a head.

25      So we have some litigation pending.  We have a lawsuit

against Ms. Malikyar to have the Court declare that we

actually own that property. We also had a complaint pending

against Coast capital to avoid the second lien and preserve

it for our benefit. So in November of last year on the

virtual eve of trial, Mr. Jacobsen and Ms. Malikyar filed --

signed our agreement judgment that's part of this Court's

record in the adversary, and I have a copy for this Court if

you'd like to see it, that shows that Tice Valley is

community property owned by Mr. Moser and has been since the

inception of the case, period.

We then proceeded with our litigation against Coast

Capital.

THE COURT: I would like to see that when you

get around to it.

MR. LEVICK: May I approach now?

THE COURT: You may.

Okay. We'll call this Exhibit 1 for purposes of the

record. And I assume there's no objection to it being

introduced.

MR. JACOBSEN: No objection.

THE COURT: It will be admitted. Let me read

it. Just a minute.

Okay. You may proceed.

MR. LEVICK: So, Your Honor, we get that

judgment in which now the estate clearly owns Tice Valley and

1   we do what Trustees would do.  We find a realtor.  We still

2   try and work with Mr. Jacobsen.  He wants us to hire a

3   certain realtor to try to sell the property.  We negotiate

4   with that realtor until we find out that that realtor is an

5   unscheduled unsecured creditor of Mr. Jacobsen's, which would

6   disqualify him from being the realtor.

7        So we hire our own realtor, Mr. McLaughlin up in

8   California who is marketing the property.  We meanwhile

9   proceed with the Coast Capital litigation.  And this Court

10  granted a default judgment by the Trustee against Coast

11  Capital avoiding the Coast Capital second lien and preserving

12  it for the estate's benefit.  Now, I haven't been able to

13  upload the final default judgment at this time because the

14  title issue is a little complicated and I'm trying to get the

15  title company in California to bless the form of judgment so

16  there won't be any title issues.

17       So Mr. Moser is now the second lien holder, which means

18  Wells Fargo, the third lien holder, is well out the money.

19  We can foreclose them out, should we want to.  If this Court

20  determines Ms. Malikyar has some valid exemption, which I'll

21  address in a second she doesn't, we can foreclose her out.

22  So we are the second lien holder.

23       So the only real lien holder out there is Greenpoint,

24  which is now Bank of America, that is owed $800,000.  He

25  schedules the property for 1.50 million.  Greenpoint hasn't

1  even filed the motion for relief from stay.  They don't want

2  the property.  There's no emergency.  And we're attempting to

3  market the property, Your Honor, just like we would in any

4  Chapter 7.

5       Now, I want to address why this exemption issue is a

6  red herring, Your Honor.  Mr. Lewis has done a lot more

7  research than I on the California exemptions and he can

8  address why it's improper, all of the reasons; she wasn't

9  living there, the sworn bankruptcy schedules indicate

10 otherwise, and all of the reasons that they have not followed

11 the California law properly.  But the real simple truth is

12 that the judgment says as of the inception of the bankruptcy

13 case this property is community property.  Because it is

14 owned by Chris Moser as community property under Section 11

15 USC 541, property of the estate, Mr. Moser owns the property.

16 The only -- Ms. Malikyar doesn't own it any more.  She cannot

17 exempt property she doesn't own.  The non-filing spouse's

18 rights are cut off.  And it's a little harsh, but that's just

19 the reality of the situation.

20      I have a cite on that, Your Honor.  And I have a copy

21 of the case for you.  It is called the Smith Wholesale Drug

22 v.  McCombs case at 2000 Bankruptcy Lexus 4264, or I have a

23 West Law cite, as well.  And I can bring up a copy of the

24 case.  But the non-filing spouse is just simply out of luck.

25               THE COURT:  You also have a copy for

1   Mr. Jacobsen, I assume.

2                   MR. LEVICK:  No, I don't, Your Honor.  I'm

3   sorry about that.

4                   MR. JACOBSEN:  Your Honor, he didn't cite

5   these in his opposition to my motion and I have no idea what

6   he's --

7                   THE COURT:  Any reason for that?

8                   MR. LEVICK:  Well, Your Honor, I had to do --

9   he -- he put down on his motion that this was set on May 4th.

10  The notice, if you'll look on your docket, he sent out a

11  notice to me of May 4th, so I thought we were set on May 4th.

12  So last week when I was informed like last Thursday or Friday

13  that we were set today, I was scrambling to get ready for

14  this.  But any way, that's --

15                  MR. JACOBSEN:  The Court changed the date,

16  Your Honor, not me.

17                  THE COURT:  Okay.  The Clerk tells me it was

18  never actually scheduled for May 4th.

19                  MR. LEVICK:  It as -- no, I understand that.

20  The notice he sent to me said we were scheduled for May 4th,

21  so we had it docketed otherwise.

22      And, Your Honor, if I may approach?

23                  THE COURT:  You may.

24      Mr. Jacobsen, this is a copy of your motion.  It just

25  shows a hearing day of May 4th.

 1          MR. LEVICK:  So, Your Honor, I apologize.  We

 2     don't try to operate that way, especially with a pro se

 3     debtor.  We don't try to hide the ball or anything like that.

 4     But this is -- you know, I'm scrambling around trying to get

 5     ready on a last second notice because we have stuff strictly

 6     calendered at our firm for certain dates.  And I really

 7     thought that we were set two weeks from today.  But in any

 8     event.

 9          But in the Smith case -- and Mr. Lewis can address,

10     he's going to address the other myriad of reasons why she

11     can't have a valid homestead.  But even if she does, we have

12     the second lien that will foreclose her out any way, should

13     we choose to foreclose.  So what we're left at right now is

14     you have a first line for 800; a property worth 1.50 million;

15     the third lien holder we will either foreclose out or they

16     will again agree to take a very nominal amount of money.  And

17     this is a -- our big asset in this case.  And it would be an

18     injustice to have Mr. Jacobsen who has twice thwarted us to

19     render, resolve and sell this.  To somehow have this property

20     go to his wife would defeat the whole purpose of the

21     Code, Your Honor.

22          Excuse me one second.

23          So just to recap, there's no emergency.  There's no

24     motion for relief from stay.  We have a very reasonable first

25     lien holder.  And I would ask that the objection be denied,

1    Your Honor.  And I may have a few other exhibits to offer, if

2    that's all right.  If you want me to do that at this time.

3                    THE COURT:  No.  I'm going to let you do it in

4    response.  I think we're -- we kind of started off in the

5    wrong direction.  Mr. Jacobsen should have gone first.

6        But before we do that, why don't you give me a copy of

7    that case and I'll have somebody photocopy it and bring it

8    back out so Mr. Jacobsen can have a copy also.

9        If you'll just wait a minute.  Shirley, why don't you

10   just go ahead and ask somebody to copy it.  Have them bring

11   out three copies.

12                   MR. LEWIS:  Your Honor, whiles he's doing

13   that, Mr. and Mrs. Sramek filed an objection to the motion

14   yesterday morning.  I don't know if the Court has seen that.

15                   THE COURT:  I don't think I have.

16                   MR. LEWIS:  If I may approach, I don't have

17   any extra copies.  A copy was emailed to Mr. Jacobsen

18   yesterday, as well as to Mr. Levick.  But I have -- I have a

19   hard copy that I can hand up to the Court, if you'd like.

20                   THE COURT:  All right.  Mr. Jacobsen, have you

21   seen this?

22                   MR. JACOBSEN:  No.  I was on a plane

23   yesterday.

24                   THE COURT:  Okay.  Why don't you give it to

25   Mr. Jacobsen.

1          MR. JACOBSEN:  And I haven't seen any email

2   from them at all.

3          MR. LEWIS:  I can hand up Mr. Levick's copy to

4   the bench.

5          THE COURT:  All right.

6          MR. LEWIS:  Your Honor, isn't it a -- I mean,

7   it's a little short notice for me to read over a 50 page

8   document standing here in court.

9          THE COURT:  I'd agree with that.  Let me just

10  see what we're talking about here.

11       Mr. Lewis, this indicates that, am I wrong on this, but

12  that this is your objection?

13         MR. LEWIS:  This is our objection, yes, Your

14  Honor.

15         THE COURT:  Okay.  Is there some reason you

16  didn't furnish it to Mr. Jacobsen?

17         MR. LEWIS:  I sent it by email to him

18  yesterday at his email address.  He has his laptop computer

19  here with him.

20         MR. JACOBSEN:  I checked my email.  There was

21  no email from them.

22         MR. LEWIS:  And I sent an email -- the same

23  email was sent to Mr. Levick and he got his copy.

24         MR. LEVICK:  Your Honor, Mr. Jacobsen -- I

25  sent him an email yesterday, an exhibit, and he told me he

1  was having computer problems.  So I don't know which it is,

2  Your Honor.

3           MR. JACOBSEN:  I am having computer problems.

4  It seems to be getting email okay, but I can't -- I wanted to

5  file something on Pacer and it wouldn't allow me to do it.

6  So I'm having -- I am having computer problems.  But -- and

7  emails have a way of getting lost.  Maybe it's in my spam

8  filter or something.

9           THE COURT:  Okay.  Just a minute before we get

10  started.

11       Mr. Jacobsen, I'm going to let you proceed.

12          MR. JACOBSEN:  Okay, Your Honor.

13       I'm a slow reader and I don't -- Mr. Levick has gone

14  into a long dissertation of things that don't relate to

15  this -- to what my motion is.  My motion basically is that

16  the house is homesteaded and it's protected.  Who owns the

17  second mortgage is not really an issue.  We're both okay with

18  the fact that the Trustee owns the second mortgage.  That

19  actually works in our favor.  He brought it up -- he referred

20  to it as a red herring that I was bringing up.  But all of

21  this he brought up was to try to distract the Court away from

22  the fact that the house is homesteaded.  The exhibit in my

23  motion shows that it's homesteaded.  And the case law --

24  excuse me, the law regarding homestead in California, which

25  is CCP704.730 exempts -- it -- excuse me.  That gives the

6rules under which  a homestead is followed.  And it -- and a

homestead has to be -- the person has to live there, of

course, which she has for the last -- since 2001.  And it

also covers the house upon sale for six months after the

sale.  So a person puts the house on the market, sells it,

puts the money in the bank, I guess, and then has six months

in which to buy another house.

            In this case the house was put on the market to sell.

A buyer --

            THE COURT:  Let me just ask you a question.

            As I understand it, you don't dispute that the Trustee

owns the second mortgage; is that right?

            MR. JACOBSEN:  No.  That's not part of my

motion.  I don't dispute that.

            THE COURT:  And what's your opinion of the

value of the property?

            MR. JACOBSEN:  I think it's probably close to

what they're asking, maybe a million dollars, maybe 950.

            THE COURT:  So how much will the second lien

use of any value on the property?  How much is there above

the second lien?

            MR. JACOBSEN:  That -- nothing.

            THE COURT:  Nothing.  Well, if the Trustee

owns the second lien and you admit that, then what are we

fighting about?

1          MR. JACOBSEN:  Well, I don't have a problem
2   with the loans that are on the property, including the Wells
3   Fargo loan.  I believe in paying back debts that are
4   borrowed.  So I would eventually probably pay back the Wells
5   Fargo loan, even though they're in a very tenuous position.
6   But if the Trustee owns the second mortgage than we would
7   just make payments on the second mortgage just as they're
8   called for in the note.
9          THE COURT:  Have there been payments made as
10  this case has gone along?
11         MR. JACOBSEN:  There were no payments called
12  for on the note, originally.  So it was an interest only with
13  the payments --
14         THE COURT:  Have the interest payments been
15  paid?
16         MR. JACOBSEN:  They're just accruing.  It's
17  with the note.  The note calls for the payments that accrued.
18         THE COURT:  All right.  You may proceed.
19         MR. JACOBSON:  So the house was out on the
20  market to sell before I filed bankruptcy.  The buyer, the
21  Davis', were found and were ready to close.  One business day
22  before close the sale was stopped by an action of law.  An
23  attorney in California representing the Srameks filed a lis
24  pendens which was later found to be completely improper and
25  was expunged.  But it managed to stop the sale.  We didn't

1  get -- I didn't get my commission from selling what I thought

2  was her house because we then at the time felt that it was

3  separate property.  And it forced me to file bankruptcy.

4      The house was never rented out before that.  But the

5  Davis' had sold their house and they needed a place to live

6  and so there was an agreement of what's called an --

7              THE COURT:  Okay, excuse me.

8              MR. JACOBSEN:  -- interim occupancy agreement

9  that Mr. Levick refers to the house being rented out for two

10 years.  And that's strictly because this bankruptcy has been

11 going on for two years.  The house was never intended to be

12 rented out as a rental.

13     The homestead law, as I said, covers it for six months

14 after the sale any way.  So the bankruptcy, as I understand,

15 tolled the period of time in which case Alyse Malikyar's

16 homestead would still be valid on the property.  And, in

17 fact,  she still owns it in her eyes.

18     The argument with this motion is that it was improper

19 for the Court to actually take possession of the house for

20 the Trustee that is a homesteaded property.  It does not show

21 as a homesteaded property on my schedules because they're my

22 schedules.  They're not her schedules.  She's not in

23 bankruptcy.

24     Let me address some of the things that Mr. Levick just

25 brought up.  And these are all the red herring items I was

1    talking about, but I'd like to address them any way.

2        He mentioned that I filed my bankruptcy in bad faith.

3    I filed it on my own just as myself and I did not put my

4    wife's assets on my schedules.  That was the advice I was

5    given by my attorney at the time.  We went ahead.  The Court

6    decided that I should have scheduled my wife's assets on

7    there also, and so I added he assets on an amended schedules.

8    This was why it was determined to have been in bad faith.  I

9    was just going by the advice of my attorney.  I just

10   scheduled properties that I owned, which is three or four.

11       So as the Court told me to do, I've added properties on

12   there.  That was the bad faith.

13        We've had a prenuptial and postnuptial agreement both.

14   They are not required to be recorded.  You would not want to

15   record them, just as you would not want to record a will.

16   And they're not required to be notarized.  But

17   Mr. Levick insists on bringing up how they weren't recorded

18   nd weren't test.  But they're not required to be.  And a

19   person wouldn't want to.  It's private information.

20       There was a show cause hearing mentions where the tired

21   to make a connection between me and coast Capital.  Mr.

22   Moser, the Trustee, was asked if he had any evidence at all

23   that I was at all connected with Coast Capital.  And he said,

24   No.  We have no evidence that you're connected at all.

25       The attorney --

1          MR. LEVICK:  Your Honor, I'm going to object.

2    Mr. Moser, I don't recall testified at that hearing.

3          MR. JACOBSEN:  He said it in his deposition

4    before that.

5          MR. LEVICK:   That wasn't an exhibit to the

6    hearing.  And I don't know how that's --

7          THE COURT:  That's not the way of getting that

8    in as evidence, so objection sustained.

9          MR. JACOBSEN:  So the reason for the show

10   cause was an attorney representing Coast Capital had

11   mentioned the had talked to me and I had claimed to be an

12   attorney representing -- he was representing Coast Capital.

13        Well, he came into court in the show cause and he said,

14   Well, you know, I was mistaken.

15         MR. LEVICK:  Your Honor, I'm going to object.

16   We had two long days on this show cause hearing and Mr. Greg

17   Meyer's testimony was very unequivocal.  He was not mistaken.

18   He testified he spoke to Mr. Jacobsen who represented himself

19   to be the representative of South Shore Capital and that was

20   the testimony in this court.  So -- and Judge Rhoades has

21   taken that under advisement and we're awaiting her ruling on

22   Judge Rhoades' show cause order, Your Honor.

23         THE COURT:  What's her show cause order about?

24         MR. LEVICK:  It is -- it was an order to show

25   cause against Mr. Jacobsen, South Shore Capital, the

1   representative of South Shore Capital Laurie Share -- hold

2   on, Your Honor.

3         May I approach?

4                 THE COURT:  You may.

5                 MR. LEVICK:  May I approach with our exhibit

6   book?

7                 THE COURT:  You may.

8         I assume that a copy of this has been furnished to Mr.

9   Jacobsen?

10                MR. LEVICK:  Yes.  We -- well, we sent it last

11  Thursday or Friday, I don't know.  Did you get --

12                MR. JACOBSEN:  I have never received it, no.

13                MR. LEVICK:  Your Honor, we emailed him and

14  mailed everything last Thursday, but I'll furnish him with a

15  book.  I didn't send him a book.  I sent him all of the

16  things separately.  I bound everything yesterday.

17        Your Honor, as you may note, I put our exhibit list

18  together, but Exhibit 4 is the order to show cause, Tab 4.

19                THE COURT:  Okay.  Let me just look at that.

20        Okay.  You may proceed.

21                MR. JACOBSEN:  What he just said is completely

22  untrue and it's been happening through this case.  Mr. Levick

23  is making claims that things that Mr. Meyer had said in -- I

24  don't want to go over with you two days of testimony at the

25  show cause hearing.

1                THE COURT:  If you're going to have any

2  evidence from that hearing, you're going to have to have some

3  sort of record of it and submit it to me.  I'm just not going

4  to take your word for what it is, or I'm not going to take

5  Mr. Levick's word for what it is.  I'm new to this case.  I

6  have no knowledge of it.  And that wouldn't be the way to

7  present it.

8                MR. JACOBSEN:  And you know what, it has

9  absolutely no relevance to what we're talking about here.  I

10  don't see the connection at all.  I'm just arguing because I

11  don't like to hear things that are untrue.

12                THE COURT:  Okay.

13                MR. JACOBSEN:  But what my connection is with

14  Coast Capital, it -- they don't have any evidence of any

15  connection at all.  There is an order to show cause.  We had

16  it.  We haven't got a ruling on it.  But I can't imagine

17  anything would come of this, because Mr. Meyer completely

18  changed his story once he got into court.

19                MR. LEVICK:  Objection, Your Honor.

20                MR. JACOBSEN:  I don't know what else to say.

21  It's just an order to show cause.  It didn't turn out to be

22  true.  But Mr. Levick is going on and on like it is true.

23  And I don't know how to combat these things.  I don't know.

24  I just want to move on from that.

25                THE COURT:  Okay.  You may proceed.

1       How much time do you anticipate having -- needing to

2   present your side of the case?

3                   MR. JACOBSEN:  Not very much.  Maybe 20

4   minutes.

5                   THE COURT:  All right.  I'll give you 20

6   minutes.

7                   MR. JACOBSEN:  There you go.

8       The house -- the sale of the house was objected to by

9   myself and my wife because it was believed that it was not

10  part of a bankruptcy.  It was a separate property and it

11  shouldn't be sold.  That was always the position.  That was

12  always the feeling of my wife that it was her house.  She

13  bought the house with her money.  She got the loan strictly

14  in her name.

15                  MR. LEVICK:  Your Honor --

16                  MR. JACOBSEN:  The prenuptial agreement that

17  Mr. Levick has mentioned.

18      I let you speak and I just listened.  Please let me

19  speak.

20                  THE COURT:  I'm sorry, what's your objection?

21                  MR. LEVICK:  Objection; he appears to be sort

22  of a hearsay objection.  This is really Ms. Malikyar's

23  testimony.  This wouldn't be Mr. Jacobsen's testimony.

24                  THE COURT:  Okay.  To the extent that's an

25  objection, it's overruled.

1       You may proceed.

2                 MR. JACOBSEN:  I lost track of where I was.

3       It has always been considered to be both -- excuse me,

4       considered to be her property.  She got the loan strictly in

5       her name.  The prenuptial -- and the postnuptial agreement

6       actually specifically mentions that house as being separate

7       property of her's.  And so when she and I objected to the

8       sale of the property, it was on the basis that it wasn't part

9       of the bankruptcy.  That was our primary reason.  Much later

10      it was agreed to be community property in November.

11      The homestead exemption is for $150,000.  I really

12      don't think that the dollar amount is really at issue here.

13      It's really that it's homesteaded and it should not be sold

14      by the Court.  But if you go down the other road that the

15      $150,000 exemption you take the first mortgage of 800,000 and

16      you add 150,000 to it that would go to her, if the Trustee

17      sells the property for 950, he gets nothing.  And that's

18      about what it's worth.  If he sells it for a 1.10 million and

19      has to pay a sales commission, he gets nothing.  And if he

20      sells it for 1.20 million and pays Wells Fargo its 10,000, I

21      mean, they're up to the full asking price and they get

22      nothing.  And so he's arguing about selling the property

23      saying he has all of this money that's going to come to the

24      estate, but there's no money that's going to come to the

25      estate.  This property should be released back to Alyse

1   Malikyar and now myself.  And -- because it's -- number one,

2   because it's homesteaded, just plain and simple, according to

3   CCP704730 and/or as a second argument that the $150,000

4   would -- there wouldn't be any equity any way, even if it

5   were sold.

6       All of this talk about the show cause hearing, I mean,

7   all of these things really don't -- I don't see where they

8   have any relevance.  We're in agreement that it looks like

9   now that the Trustee owns the second mortgage on the property

10  and it will remain on the property after it's abandoned back.

11      That's all I have.

12                  MR. LEWIS:  Your Honor, for clarification, was

13  that an argument, or an opening statement, or a proffered

14  testimony, or some combination of that?

15                  THE COURT:  Mr. Jacobsen, I'm taking that --

16  that's your -- what you're offering in evidence today; am I

17  correct on that?

18      I can't tell you how to present your case.  I'm just

19  asking you --

20                  MR. JACOBSEN:  I'm not a very good lawyer,

21  Your Honor.  But that was what I would call my side of the

22  story.

23                  THE COURT:  So that's your evidence; am I

24  correct?

25                  MR. JACOBSEN:  Your evidence is the Exhibit A

1    which shows that its' homesteaded by my wife.  And I have --

2    I do have my documents also that I brought.  But they're

3    basically copies of the Code, which I don't really have to

4    get -- just for convenience sake of the Court.  And I had an

5    article written by an attorney on bankruptcy law that would

6    be more eloquent than I could do.  So I put a copy of that in

7    there where he states that it's homesteaded and protected and

8    the Court should not sell something that's homesteaded.  So I

9    have those documents with me.

10             THE COURT:  So do I understand that you're

11   resting at this point?

12             MR. JACOBSEN:  Yes.

13             THE COURT:  All right.

14             MR. JACOBSEN:  Do you want me to present this

15   stuff?

16             THE COURT:  It's your case.  Whatever you want

17   to do with it.

18             MR. LEVICK:  Your Honor, these appear just to

19   be statutes that he's given us.

20             MR. JACOBSEN:  Yeah.  They're not traditional

21   exhibits, I know.  I underlined the areas of the Code that

22   are applicable.  I know you wouldn't normally put copies of

23   the Code in there.

24             THE COURT:  Okay.  I'll put this as Jacobsen

25   Number 1.

1          MR. JACOBSEN:  There's three documents in

2     there.

3          THE COURT:  Consisting of three documents.

4          It will be admitted, to the extent it has any value.

5          You may proceed.

6          MR. LEWIS:  Your Honor, first with respect,

7     just to state on the record, he attached an Exhibit A to the

8     motion.  We would object to that being evidence because it's

9     not properly authenticated.  It's not a certified copy.  And

10    there's been no evidence proving it up as an authentic copy

11    of what might be in the records in California.

12         MR. JACOBSEN:  It's just a copy of a tax

13    earlier, Your Honor.  It's something that I think came to me

14    as a copy from the County, or came to my wife.  Any way, the

15    homestead is public record.

16         THE COURT:  Are you talking about the tax

17    bill?  Is that what we're talking about?

18         MR. JACOBSEN:  Yes.  The last page of the

19    motion.

20         THE COURT:  And, I'm sorry, the objection?

21         MR. JACOBSEN:  The objection is two-fold.

22    First, it's not a properly authenticated public record.

23    Second, we would object on the basis of hearsay on the basis

24    that it's a document being offered for some purpose and it's

25    an out-of-court statement.

1       And since it's not properly authenticated as a public

2   record, it doesn't come in under that exemption.

3                   THE COURT:  The objection is sustained.  You

4   may proceed.

5                   MR. JACOBSEN:  Homestead is automatic in

6   California any way.  There's no filing.  There's nothing

7   needed to do that.  It's -- if you live in the house, it's

8   homesteaded.

9                   MR. LEWIS:  Your Honor, what Mr. Jacobsen just

10  said is the crux of this case, to the extent whether it's a

11  homestead or not is even relevant to a motion to abandon.

12      First, we believe -- I would submit that a motion to

13  abandon --

14                  THE COURT:  Let me -- before we get started,

15  Mr. Lewis, I'm going to get a time estimate from you too.

16  I'm going to try to keep you all pretty much on time

17  estimates.

18                  MR. LEWIS:  Ten minutes and I'd like five

19  minutes to cross-examine Mr. Jacobsen.

20                  THE COURT:  Why don't you cross-examine him

21  first and then take your ten minutes.

22      Mr. Jacobsen, please raise your right hand and be

23  sworn.

24                  (The witness was sworn by the courtroom deputy.)

25                  THE COURT:  Mr. Jacobsen, take the stand over

1   there.

2                    <u>ROBERT JACOBSEN</u>

3   The witness, having been duly sworn to tell the truth,

4   testified on his oath as follows:

5                    <u>CROSS-EXAMINATION</u>

6   BY LEWIS:

7        Q.   Mr. Jacobsen, do you recall what date you filed for

8   Chapter 13 protection in this court?

9        A.   I do not.

10       Q.   All right.  Is it May of 2007?

11       A.   That's what I recall, May of 2007.

12       Q.   And as of May of 2007 who was residing in what we

13   call the Tice Valley property?

14       A.   My wife was residing there and I was there quite a

15   lot as a second home of my own.

16       Q.   Okay.  When did Mr. and Mrs. Davis move into that

17   house?

18       A.   I could -- it's some time about that same time.  I

19   can't remember.  The house was sold right around that.

20       Q.   So it's your testimony under oath, Mr. Jacobsen,

21   that on the date that you filed for bankruptcy in this court,

22   you and your wife were physically living in the Tice Valley

23   house in California?

24       A.   That is not my testimony.  I don't recall the

25   dates.  We moved about that time.  We may have moved just

1  prior, just barely before that.  It all happened about that

2  same time.

3      Q.   Okay.  Now, before you --

4              THE COURT:  Let me interrupt.  I don't

5  understand your testimony.  You're saying you were in the

6  house at that time or you were not?

7              THE WITNESS:  No.  I'm saying I don't recall

8  as far as the date goes because it all happened --

9              THE COURT:  You don't recall one way or the

10  other?

11              THE WITNESS:  I don't.  Actually, we may have

12  moved just prior to me filing.  I don't remember.

13              THE COURT:  Moved in or moved out?

14              THE WITNESS:  Moved out of the house where the

15  Davis' -- I just don't remember.  A lot of things happened

16  very quickly right about that time.

17      Q.   Isn't it true, Mr. Jacobsen, that before you filed

18  bankruptcy in this court you and your wife had purchased

19  property in Lafayette, California which we refer to as the

20  Vista Bella property?

21      A.   That's incorrect.

22      Q.   What's incorrect about that?

23      A.   My wife purchased -- it's a business partnership

24  that she was involved in that I wasn't involved in.

25      Q.   And isn't it true that when you bought -- when your

1  wife bought the property called Vista Bella, you and your

2  wife moved into that property?

3      A.   That is true.

4      Q.   And since you filed for bankruptcy in this court

5  you and your wife, Ms. Malikyar, had been living in the Vista

6  Bella property continuously?

7      A.   Yes.

8      Q.   In fact today -- as of today, you and Ms. Malikyar

9  are living at the Vista Bella property?

10     A.   It's Malikyar.  And, yes.

11     Q.   And since filing for Chapter 13, you and your wife

12 have not resided in the Walnut -- in the Tice Valley

13 property, have you?

14     A.   Other than my recollection of the exact date we

15 moved, that would be a true statement.

16     Q.   And since you filed for bankruptcy the people that

17 had been living in Tice Valley had been Mr. and Mrs. Davis,

18 the people you're wanting to sell it to, right?

19     A.   Yes.

20     Q.   And, in fact, you entered into that contract to

21 sell the Tice Valley property to Mr. and Mrs. Davis before

22 you filed for bankruptcy, didn't you?

23     A.   No.

24     Q.   You entered into that contract after filing for

25 bankruptcy?

1   A.   I've never been in a contract to sell that.

2   Q.   Your wife did.

3   A.   Restate your question.

4   Q.   Your wife a contract to sell the property to Mr.

5   and Mrs. Davis before you filed for bankruptcy, didn't she?

6   A.   Yes.

7   Q.   And that sale was pending when you filed for

8   bankruptcy, wasn't it?

9   A.   Yes.

10   Q.   And isn't it true that your wife -- do you know

11   what -- tell the Court what you believe you have to do to

12   declare a homestead in California.

13   A.   It is my belief in California that the homestead is

14   automatic if you live in it.  There's not a document that

15   needs to be filed to make it a homestead.

16   Q.   Now, you're a licensed real estate broker in

17   California, aren't you?

18   A.   Yes.

19   Q.   And isn't it true, Mr. Jacobsen, that in order to

20   declare a homestead in California, you actually have to file

21   what's called a declaration of homestead?

22   A.   That's not true.

23   Q.   What's -- what do you file to inform the

24   authorities that you're declaring property a homestead?

25   A.   As I said, you don't have to file anything.  In

1    Texas you do.  I believe you do in Texas.  But in California

2    you do not.    There is a form you can file, the form

3    admission.  But it's not required.  It's automatic.

4        Q.   Isn't it true, Mr. Jacobsen, that this form that

5    you can file, your wife had not filed that form in California

6    designating or declaring Tice Valley as a homestead as of the

7    date that you filed for bankruptcy, right?

8        A.   I don't know what my wife did or didn't file.

9        Q.   Okay.  And you don't have a copy for the Court of

10   any declaration or designation of California homestead filed

11   by your wife, do you?

12       A.   All I have is the tax bill showing it's homestead.

13       Q.   And all of the things on that tax bill is whether

14   it might be considered exempt for tax purposes, right?

15       A.   It has -- it shows it's homesteaded very clearly.

16       Q.   But it doesn't show who's declaring -- strike that.

17        Now, you testified in a California case and deposition

18   shortly before filing for bankruptcy, didn't you?

19       A.   I don't know which case you're talking about.

20       Q.   Okay.  Didn't you testify in a deposition in

21   California that you were living in Texas and your wife was

22   living in Texas with you?

23       A.   She and I both have two homes.  At that time we had

24   two homes.

25                   THE COURT:  What time are we talking about?

1        THE WITNESS:  Just some time before.  I'm not

2  sure he's a bit vague on his date, too.  But we were out of

3  the country for two years where we were on a sailboat in the

4  Caribbean and we used an address in Texas, in Frisco.  I had

5  a secretary handling my bookkeeping and things and that was

6  my --  my address for then.  After we returned, I lived in

7  Allen in a house on Springs Way.

8        THE COURT:  I have no idea where that is.  Is

9  that in Texas or California?

10        THE WITNESS:  Allen, Texas.

11        THE COURT:  Oh, Allen.  Okay.  I didn't

12  understand you.

13        THE WITNESS:  I'm sorry.  I've got a cold.

14    Q.    Mr. Jacobsen, I handed you earlier today a copy of

15  the objection that was filed by Mr. and Mrs. Sramek yesterday

16  to your motion.  Attached to that objection were some pages

17  of a deposition transcript for you in that California case.

18     Did you read those?

19    A.    No, I didn't get to that.

20    Q.    Okay.  Do you have that with you?

21    A.    No.

22    Q.    Is that over there on your -- I'd like to retrieve

23  the copy I gave him so I can show him and ask him about it.

24        THE COURT:  All right.  You may.

25    Q.    Can you tell me where it is?

1      A.   I can see it on top with the blue edge on it there.

2           You're welcome to bring that.

3           Is that correct?

4      Q.   No.  This is what Mr. --

5      A.   I don't have -- didn't bring my glasses with me.

6           It's not here.  I guess I don't have it.

7                MR. LEWIS:  Your Honor, I know that I handed

8      my copy to Mr. Jacobsen.  I handed the Court Mr. Levick's

9      copy.  That's why we have no copies down here.

10     A.   Everything you handed me is right here.

11               THE COURT:  Apparently it's on the table right

12     there.

13               MR. LEWIS:  May I approach the witness, Your

14     Honor?

15               THE COURT:  You may.

16               MR. LEWIS:  And for the Court and for the

17     record, I'm referring to Exhibit 2 to the objection.

18     Q.   Mr. Jacobsen, I'd like you to read to yourself the

19     Exhibit 2 to that objection which is a -- pages from an April

20     2nd, 2007 deposition transcript of you in the California

21     case.  And when you finish, would you tell the Court if

22     that's a true and correct copy of the transcript, as best as

23     you recall?

24     A.   I can make the same objection to this as you made

25     about my tax bill, this is not a certified copy?

1          THE COURT:  Okay.  I'm overruling it at this

2   time.

3          THE WITNESS:  Okay.

4     A.   And you want me to read the whole thing?

5     Q.   And tell me if that testimony that you gave in that

6   deposition is transcribed as true and correct?

7     A.   Okay.

8     Q.   Is there anything wrong in that transcript?

9     A.   Anything wrong?  Can you be more specific?

10    Q.   Well, did they -- is that -- was that testimony

11  true and correct when given?

12    A.   Well, I just scanned through it quickly.  I don't

13  think I'd want to be held to every word in this being correct

14  or not correct.

15    Q.   You were under oath when you gave that testimony;

16  were you not?

17    A.   Yes.

18    Q.   And you did not notify the court reporter of any

19  corrections or errors in the transcript of that deposition,

20  did you?

21    A.   I don't recall.

22    Q.   And didn't your testimony in April of 2007 state

23  that Ms. Malikyar, your wife, lived with you here in Texas at

24  the homestead you were claiming, a residence you were

25  claiming here in Allen?

1    A.    You used the word "homestead", that's not correct.

2    Q.    Turn to Exhibit 1 of that document, please.

3         Do you recognize that as a preliminary title report for

4    the sale of the Tice Valley property prepared in 2007?

5    A.    Do you want me -- it's many pages.  Do you want me

6    to look at anything in particular?

7    Q.    No.  I just was asking, is that -- does that appear

8    to you to be the preliminary title report for the sale of the

9    Tice Valley property to the Davis' in 2007?

10   A.    It does appear to be that.

11   Q.    What's the date on it?

12   A.    June 15th, 2007.

13   Q.    After you filed your Chapter 13?

14   A.    This would be after it, yes.

15   Q.    Okay.  And it was prepared for -- well,

16   Ms. Malikyar, correct?

17   A.    Malikyar.

18   Q.    Malikyar.

19        That's prepared for her as the seller, right?

20   A.    Yes.

21   Q.    Is there any place on that preliminary title report

22   that states that the property being sold, i.e.  the Tice

23   Valley residence, was a homestead?  It had a homestead

24   designation or a homestead declaration?

25   A.    I don't believe it says that.  It doesn't normally