1    say that on a preliminary title report.

2        Q.    But there's no designation of homestead in that

3    title report?

4        A.    No.  And it's normal that there wouldn't be.

5        Q.    And that's -- but that's your position, it would be

6    normal?

7        A.    Yes.

8        Q.    Now, you told the Court that the California

9    homestead exemption is $150,000 sealed?

10       A.    Yes.

11       Q.    And then you argued that the Trustee has no value

12   because Ms. -- because your wife would get the first $150,000

13   from any sale?

14       A.    Any profit to it, yes.  That's -- that's my

15   understanding.

16       Q.    Okay.  Now, the second -- you're not -- are you

17   testifying to the Court that -- arguing to the Court that

18   your wife gets the $150,000 before those various mortgages

19   get paid?

20       A.    You know, I thought of this and I don't have an

21   answer for that.  If the -- I just don't know where that

22   second mortgage holds.  If it's now property of the estate, I

23   haven't completely resolved that in my mind where that sits.

24       Q.    Your wife voluntarily signed any mortgage held by

25   Coast Capital, correct?

1    A.    Yes.

2    Q.    And under the laws of the State of California, that

3 mortgage is valid even if the property is a homestead, isn't

4 it, a voluntary mortgage on the property?

5    A.    Valid?  Many mortgages are invalid that have been

6 signed and put -- we're seeing that every day today with the

7 foreclosures and the bad real estate market.

8    Q.    My question to you, Mr. Jacobsen is, the fact that

9 this property might be a homestead is not a reason for

10 invalidating the Coast Capital mortgage, is it?

11   A.    No.  It's irrelevant.

12   Q.    And, in fact, when you were proposing to sell the

13 property to the Davis' as a Chapter 13 debtor, you had not

14 challenged the Coast Capital mortgage as being invalid

15 because it encumbered homestead property, did you?

16   A.    Are you asking me if I -- I'm not the seller.  It

17 wouldn't be my job to challenge it.

18   Q.    But you didn't object to Coast Capital getting paid

19 from the proceeds, did you?

20   A.    I didn't have anything to do with objecting or not.

21   Q.    And your wife didn't object to it either, did she?

22   A.    I don't -- you'd have to ask her.

23   Q.    I mean, you don't recall any objection being filed

24 in the case by her, do you?

25   A.    I do not recall her objecting.

1          MR. LEWIS:  I'll pass the witness, Your Honor.

2          <u>CROSS-EXAMINATION</u>

3   BY MR. LEVICK:

4      Q.   Did you reside at the Snows Hill property in Texas

5   when you filed bankruptcy?

6      A.   No.

7      Q.   Did you intend to later reside at the Snows Hill

8   property in Texas when you filed bankruptcy?

9      A.   I don't know if I've thought of that or not.

10     Q.   When you attempted to sell the property for the

11  first time, did you have a carve out for Alyse Malikyar to be

12  paid any exempt proceeds?

13     A.   The first time I decided to sell the property,

14  meaning the Snows Hill property?

15     Q.   Tice Valley.

16     A.   Oh, Tice Valley property.

17       Say that again.  Ask it again.

18     Q.   When you in the Chapter 13 were trying to sell the

19  Tice Valley property, did you have a carve out for Alyse

20  Malikyar for her alleged homestead interest?

21     A.   I had to put three lien holders.  I -- my memory

22  isn't the same as your's.  I don't remember that I wanted to

23  sell the property at all.

24     Q.   In the Chapter 13, did you not file a motion to

25  sell Tice Valley that's in the Court's docket?

1    A.   I don't know why I would -- if I did, I don't

2  recall doing that.  It's been two years ago.  I don't know.

3  I really don't remember.

4    Q.   Are you telling me that you don't recall -- we've

5  had several hearings about this.  You filed a motion to sell

6  in the Chapter 13 that was objected to by Ms. Countryman and

7  Mr. Lewis.

8    You don't remember filing a motion to sell the property

9  to the Davis'?

10    A.   I remember the hearing.  I remember the discussions

11  of it.  I don't remember the exact form of the motion or the

12  wording that was in it.  It would still seem that it's my

13  wife's house.  At that time I believed it was my wife's

14  house.  I was -- in my mind it was probably just agreeing to

15  the sale.

16    Q.   Even though there's a motion with your name on it

17  filed.

18            MR. LEVICK:  I don't have anything further,

19  Your Honor.

20            THE COURT:  Anything further from you,

21  Mr. Jacobsen?

22            MR. JACOBSEN:  I'm sorry?

23            THE COURT:  Anything further from you as far

24  as evidence goes?

25            MR. JACOBSEN:  No.  I just stand on the fact

1  that it's a homesteaded property and it's exempt.  It's

2  public record.  I'm sorry I didn't bring a certified document

3  of it, but she's lived in it since 2001.  Her son has lived

4  in it during the time we were out of the country.  He still

5  lives with us.  And that also is mentioned in the homestead

6  law.

7       I think it's just that simple.  I think everything

8  surrounding the other issues that they're bringing up are

9  strictly to confuse the plain and simple truth that it's

10  homesteaded and it should be exempt.

11            THE COURT:  Okay.  You may step down.

12       Any further cross-examination of the witness?

13       All sides have rested and closed on evidence.  I'll

14  give each side a total of ten minutes to make any further

15  arguments they wish to make.

16       You go first, Mr. Jacobsen.  If you don't reserve any

17  time, then when you finish your ten minutes, you're finished.

18  So if you do reserve time, then you'll have to stop some time

19  in that ten minutes.

20       Okay.  You may proceed.  I think you -- both sides

21  have pretty well stated what they -- what their positions

22  are, so you don't necessarily have to go over that.  But

23  whatever you want to do.

24            MR. JACOBSEN:  I believe you're right.  I

25  think that it would just be reiterating the same thing.  So I

1    reserve the time to respond to his.

2              THE COURT:  All right.

3              MR. LEWIS:  I'll be as brief as I can, Your

4    Honor.

5         We'd refer the Court to the cases, Baketell bankruptcy

6    and other cases cited in our objection regarding the

7    requirements of a California homestead.  And we submit that

8    he hasn't -- that this property doesn't qualify under the

9    requirements because, first of all, there's no written

10   declaration or designation of homestead on file.  As of the

11   bankruptcy filing date there's been no proof or evidence that

12   there's a written declaration of homestead as of that date.

13        Second, it would not apply because you have to live

14   there.  It's not like Texas.  You actually have to use it as

15   your residence.  The evidence is, they weren't living there,

16   neither of them was living there at the time and haven't

17   lived there throughout the course of this bankruptcy case.

18   The Court can take judicial notice of Mr. Jacobsen's

19   bankruptcy schedules filed in this case where he claimed a

20   Texas homestead.  The property that was listed as exempt on

21   his schedules is property in Texas.

22        The testimony in his deposition shortly before -- less

23   than a month -- about a month before he filed for bankruptcy

24   was that, yes, his wife, Mrs. Maliykar, also lived there in

25   Allen, Texas.  So he didn't -- it doesn't qualify as a

1  homestead, even if that was a sole reason for abandonment in
2  this case.  We think the Trustee has shown that there is not
3  only -- there's substantial value to the estate, it's
4  certainly not inconsequential, I don't think grounds have
5  been shown to abandon the property.
6          MR. JACOBSEN:  Can I respond to that?
7          THE COURT:  I'll let you respond when
8  Mr. Levick finishes.
9          MR. LEVICK:  Firstly, Your Honor, I just want
10 to say, because I know that the Court regards its time very
11 seriously, this certainly was not an emergency.  There was no
12 motion for relief from stay on file.  So for Mr. Jacobsen to
13 call this an emergency hearing I think is not appropriate.
14         MR. JACOBSEN:  It wasn't an emergency hearing.
15         MR. LEVICK:  On the section on abandonment in
16 the Code he -- there's been no evidence to meet the test.
17     Mr. Jacobsen admitted that the Trustee has the second
18 lien.  That the first lien is approximately $800,000.  His
19 schedules reflect a value of 1.50 million.  If this Court
20 somehow agrees that there's some sort of homestead, then the
21 Court -- we can simply foreclose out and become the owner and
22 foreclose subject to the first lien and sell.
23     Your Honor, twice this property was almost sold which
24 would have been a big benefit for the creditors.  And
25 Mr. Jacobsen has thwarted this twice.  So then on the eve of

1   trial, we have Ms. Malikyar signs a judgment that says, it's

2   community property.  And how at the 11th hour she comes up

3   with some sort of homestead exemption --

4               THE COURT:  I'm unclear as to what judgment

5   we're talking about.

6               MR. LEVICK:  It's the judgment I furnished as

7   our Exhibit 1.

8               THE COURT:  All right.

9               MR. LEVICK:  Which we were trying -- the Court

10  wanted us to get a declaration that the Tice Valley property

11  was property of the estate.  And it's the one that you said

12  you would mark as Exhibit 1 when I came up to the Court.

13  It's the judgment --

14              THE COURT:  Okay.

15              MR. LEVICK:  That Ms. Malikyar signed off on.

16              THE COURT:  Okay.

17              MR. LEVICK:  By making it community property,

18  Your Honor, it is owned by Mr. Moser.  She can no longer

19  accept.  You can't have non-filing spouses claiming separate

20  exemptions from the spouse.  The only -- 522(b) is very clear

21  that Courts have interpreted 522(b) to mean that only a

22  debtor and not the non-debtor spouse has the authority to

23  elect exemptions, period.  And I'll cite you to page 6 and 7

24  of the case that I furnished to you that I wish I would have

25  furnished and had time to do a brief earlier, but I thought

1    the hearing was a week later.

2         There is simply no evidence here on the abandonment.

3    And this is just more of Mr. -- what we've had to go through

4    in this case to just try to administer assets, Your Honor,

5    like a normal Chapter 7 Trustee would do in any case.  I

6    would ask that this motion be denied.

7              THE COURT:  Okay.  Let me -- refresh my

8    recollection.  Who is on the phone, or who is that person

9    representing?

10             MS. MALIKYAR:  This is Alyse Malikyar.

11             THE COURT:  Oh, okay.

12    Okay.  Mr. Jacobsen.

13             MR. JACOBSEN:  Let me address these one at a

14   time.

15         They made the claim that there's no written, you know,

16   document for the homestead, which I've already addressed that

17   there is none required in California.  You just have to live

18   there.

19         Alyse Malikyar did live there.  She has lived there

20   continuously up to the time of about my filing of the

21   bankruptcy.  And I'm sorry if I don't remember within a week

22   or two when we moved out.  But it was right about that same

23   time.

24         California Code, which I've provided you a copy in my

25   documents, allows for six months after you move out for the

1  exemption for homestead to still apply.  So their argument

2  that she wasn't living there the second that I filed

3  bankruptcy is not relevant.

4      I filed my initial schedules where I did not put the

5  Tice Valley house on the schedules and per the advice of my

6  attorney, he said we'll claim one of the houses you own in

7  Texas, so I did, because it's just the one I used for my

8  address when I was out of the country.  I had a room there

9  that I would go and I could stay there.  I mean, that's the

10 only real estate that I had that I had a bed in in the United

11 States.  And so his recommendation was to claim that.

12     In my amended schedules I turned that around.  I took

13 that off.  I did not claim any homestead exemption.  And so

14 my wife clearly has a homestead on the house in Tice Valley

15 because it complies with all of the rules.  She's lived there

16 continuously.  She moved out to sell the house to somebody

17 else where she would normally take that money and buy another

18 house which will be homesteaded.

19          THE COURT:  Now as I understand it, you don't

20 dispute the fact that the lien is still on the property if

21 the Trustee owns it?  In other words, that would have to be

22 paid before your wife could receive anything out of this; is

23 that --

24          MR. JACOBSEN:  Exactly.  Exactly, Your Honor.

25 And that's why it's even more important to allow this.

1  Because the -- it doesn't change the Trustee's monetary

2  position at all by abandoning the house.  There's not going

3  to be enough money in the sale of the house to pay the full

4  amount of the lien any way.

5              THE COURT:  Then she'd get nothing out of it

6  either, would she?

7              MR. JACOBSEN:  Yes, she would.  Because she's

8  going to refinance and pay -- probably pay off the Trustee

9  and pay off the first mortgage, and pay off -- I think she'll

10  negotiate with --

11             THE COURT:  No.  This is something new that I

12  haven't heard before.  Was I incorrect?  Have you said

13  anything about this before that she was going to refinance

14  this house?

15             MR. JACOBSEN:  No.  There's two things that --

16  she wants to keep the house, Your Honor.  We both want to

17  keep it and move back into it.  It's not -- I didn't really

18  see that it was relevant here because the argument is about

19  the homestead that was honored at the time that the

20  bankruptcy was filed.  So I didn't --

21             THE COURT:  Even if what you're saying is

22  true, and even if she has a homestead and you have to

23  refinance it, then she's still going to have to pay off this

24  mortgage, isn't she?

25             MR. JACOBSEN:  Yes.

1          THE COURT:  Which the Trustee owns.

2          MR. JACOBSEN:  Which the Trustee owns.  So by

3 abandoning the house doesn't change anything about the money

4 that would come to the Trustee.  He still would get his

5 money.  The homestead still is valid.  It's still exempt.

6 And then she refinances or sells the house, or the bankruptcy

7 is over and the money is just left over.  It just goes back

8 to -- what would it go back to, me, if there's money left

9 over?  So it doesn't change anything by abandoning the house.

10 The Trustee would still get his money.

11          THE COURT:  Okay.  Does that complete your

12 argument?

13          MR. JACOBSEN:  No.

14          THE COURT:  Okay.  You have two minutes.

15          MR. JACOBSEN:  Okay.  I'll go fast.

16     It's been mentioned that my wife lived in Texas.  And I

17 did day she lived in Texas, that's true.  But her homestead

18 and primary residence was in California.  She lived in two

19 different locations.  So that's an accurate statement, but

20 they have tried to twist it around saying that she didn't

21 live in California and that's not the case at all.

22     I didn't amend my schedules a third time to show an

23 exemption for homestead because I was advised that I had

24 already amended them twice and that was enough and that the

25 Court really wouldn't look kindly on me changing the

1 schedules for a third time.  But if you were to allow me to,

2 I could go ahead and amend the schedules at this time and do

3 that.

4     And then it was brought up a non-debtor spouse can't --

5 you know, motion to abandon.  But it's -- it's now community

6 property.  It's a homesteaded property.  And the motion is

7 completely proper that I am motioning to abandon property.

8     That's all.

9          THE COURT:  All right.  We'll take a ten

10 minute recess and I anticipated making a ruling by that time.

11          (Brief recess ensued.)

12          THE COURT:  Please be seated.

13     The ruling is as follows.

14     The motion to require the Trustee to abandon the real

15 property, Tice Valley Boulevard, Walnut Creek, California is

16 denied.  However, there's some conflict on the testimony.

17 Mr. Jacobsen personally testified in his deposition that he

18 and his wife, Alyse, lived together in Texas since 12/05.

19 The debtor has failed to prove that the subject property was

20 or is burdensome or of inconsequential value or benefit to

21 the estate.  This would be a necessary prerequisite finding

22 for the debtor to have been successful on his abandonment

23 motion.

24     It is further undisputed that the second lien position

25 is owned by the Trustee and would have to be paid off before

1 Mrs. Jacobsen would receive any funds, if any, from any claim

2 of homestead.

3        Reserve the right to make further findings of

4 conclusions.

5        Anything further from either side?

6        Okay.  We stand adjourned.

7        Excuse me?  Oh, okay.  Didn't realize we had another

8 motion.

9                THE LEWIS:  Your Honor, may I be excused from

10 the second motion?  I think Mr. Levick can handle that one

11 well without me.

12                THE COURT:  Okay.

13                MR. LEWIS:  It will make it go faster.

14                THE COURT:  That's probably true.

15                MR. LEVICK:  Your Honor, is the Court going to

16 issue an order on that, or do I need to draw up an order?

17                THE COURT:  Just draw up an order.  You can

18 say the -- in the order you can say the motion for

19 abandonment is denied for the reasons stated on the record.

20 That would be sufficient.

21                MR. LEVICK:  Thank you.

22                THE COURT:  You may proceed.

23                MR. JACOBSEN:  Okay.  The second motion is

24 regarding the remaining Texas houses that are part of the

25 estate.

1      When the amended schedules were drawn they showed

2  seven, I believe, houses in Texas that were owned some of

3  them by my wife and some of them by myself that became

4  community property because of the -- the stipulated judgment.

5      Three of them have been abandoned back.  They've all

6  been on the market for going on a year now trying to sell

7  them.  With the real estate market that it is, the property

8  value has gone down.  There is no real -- they've made every

9  attempt to sell them and they haven't sold them and the

10  argument is that they should be abandoned along with the

11  other three that have already been abandoned.

12      That's it.

13          MR. LEVICK:  Your Honor, I'm going to make a

14  little briefer opening than I made last time.  I wanted to

15  give you a flavor of the case and I was able to do that

16  through the last hearing.

17      Your Honor, this case has been extremely difficult.

18  When we filed our motion last year to employ Michael Crane,

19  Mr. Jacobsen filed his own objection to the motion.  And we

20  had a hearing here in the court that lasted several hours to

21  employ a broker.  I've never even had a hearing before to

22  hire a broker.  I've never even received an objection in all

23  my history as being a bankruptcy lawyer.  But that hearing

24  lasted several hours.

25          And the reasons that Mr. Jacobsen posited in his

objection is he didn't want the Trustee administering the
assets.  He didn't want the Trustee trying to sell houses.
And a lot of other reasons that really didn't make sense.

The judge granted Michael Crane the ability to start go
selling properties about a year ago.  But it really wasn't
until November of this year when the stipulated judgment was
entered into that Michael Crane really had the ability to go
full force and sell these houses, Your Honor, because they
were cloned in Alyse Malikyar's name, even though we knew
they were really community property and we needed that agreed
judgment to satisfy title concerns so that he could sell.

So we've had these four houses since November trying to
sell them, Your Honor.

Now, I'm going to talk about the four properties and
what is happening to give a flavor and then I'm going to make
sort of -- tell you what Mr. Moser -- what Mr. Moser is
thinking.

One of the houses is the Appalachian house.  And I
would like the Court to take judicial notice of a motion to
sell that we filed yesterday on Appalachia.  And I emailed
that motion to Mr. Jacobsen yesterday as soon as we filed it.
The second after we filed it.  And what the Appalachia sale
proposes to do, there are two liens on the property, both by
Wells Fargo.  Wells Fargo will agree to release its second
lien and on the first lien agree to some sort of reduction so

1  that the estate can generate at least $3,000.  But based on

2  our discussions with their representative, the estate could

3  generate as much as 8, 9, or $10,000 from the sale.

4      Now, Your Honor, what was the subject of a big hearing

5  about a year ago was Michael Crane testified for a while

6  about the subject of short sales.  He said, We have this new

7  thing that has hit the economy.  And, boy, could he see the

8  future when he testified.  And the thing that is happening is

9  the short sales where first lien holders do not want their

10  property back.  We're able to get a contract.  We're able to

11  go to the first lien holder, the second lien holder, get them

12  to take a reduction.  Carve out money for the estate and get

13  a sale approved.

14      And Judge Rhoades approved his employment with the

15  understanding that there will be some short sales.  And we

16  sold some of these properties already.  And I believe one has

17  already been a short sale that's been approved, Your Honor.

18  So that's the Appalachia property.

19      The second property is the Sailmaker property.  Your

20  Honor, the schedules show that there's equity, Your Honor.

21  Mr. Crane can testify about the interest he's gotten on

22  Sailmaker.  And, Your Honor, Sailmaker is an income producing

23  property, Your Honor.  We have a tenant in there and we're

24  receiving rents.

25      The original lift stay order on Sailmaker, Your Honor,

1  that the stay does not lift until the very end of July, which

2  means that they cannot even post until September.  So we

3  certainly need more time to sell Sailmaker, especially since

4  this is the selling season.  And Mr. Crane is confident he

5  can sell that one.

6      The third property is Snows Hill.  The mortgage

7  company is Saxon Mortgage.  The stay did lift on April 4th,

8  Your Honor.  It is our understanding they have not posted for

9  May and that they are not anxious to post this property and

10  would like us to try and sell it.

11      We have a tenant in there paying rent.  And we would

12  like to keep the Snows Hill property and have a little bit

13  more time to try to sell it, especially since it hasn't been

14  posted.

15      The fourth property is Streams Way, Your Honor.  The

16  stay did lift earlier on Springs Way.  We have no tenant.

17  And we're prepared to abandon Springs Way on the record, Your

18  Honor.

19      These properties are insured.  The remaining Sailmaker

20  and Snows Hill, they're income producing, Your Honor.

21  Appalachia we have a motion to sell.  I would ask the Court

22  to allow us to abandon Streams Way on the record and let us

23  go about trying to administer our estate, Your Honor.

24          THE COURT:  Okay.  Streams Way abandonment

25  motion will be granted by the -- both parties on Streams Way.

1             MR. JACOBSEN:  These properties were purchased

2    by my wife as part of our business.  We're in the real estate

3    investment business.  We buy, run, operate, and manage

4    properties.  This is her investment portfolio that doesn't

5    really have any equity because many of them were bought with

6    nothing down loans.  But they're producing rent.  And this is

7    part of our business, Your Honor.  This isn't just an

8    investment.  The management of these properties, renting them

9    out, this is part of our income.

10         The Trustee has -- has collected the rents on these

11   properties and made no payments on them at all.  I'm new to

12   this bankruptcy business.  But it's my understanding that the

13   Bankruptcy Court's objective is to protect the interest of

14   secured creditors.  And I can't see where not making any of

15   the payments on it and attempting to sell the house at a low

16   price and basically pay them -- either wash them out on the

17   second or pay them considerably less on the first in order

18   for the Trustee to gain $2,000 is watching out for anybody's

19   interest except for the Trustee's.  And its billable hours

20   are probably more than the $2,000.  And I just -- I mean,

21   I've always believed in paying my debts.

22         And I think that Wells Fargo should get on the

23   Appalachia house -- if we retained that house, they'd keep it

24   for another fives years.  They'd get all of their money when

25   we sold it.  And that would be protecting the interest of the

1   investors that are on these properties.  The investors

2   meaning the lenders.  And to grind the lender down by 50,000

3   or $30,000, or whatever, just so he can get $2,000, I don't

4   understand the thinking on that.  There's, you know -- and

5   then there's the issue that this is our business that they've

6   taken these houses.

7           The Snows Hill house on April 4th the stay lifted and

8   they can sell the house at any time.  They are more than

9   willing to have us keep the house.  That's my house, not my

10  wife's.  And I believe we'd negotiate some desirable terms

11  where we could make up the back payments or something.  I

12  don't know.

13                  MR. LEVICK:  Excuse me, which house was that?

14                  MR. JACOBSEN:  Snows Hill.

15          And the comparable sales there that I've provided as my

16  exhibits to my motion show that there is no equity in it.

17  It's just a matter of collecting the rents, making the

18  payments on the house, which they're not doing, and we get a

19  tax deduction for depreciation on the property.  It's all

20  part of the business venture.  And for them to hold it

21  hostage for any longer collecting the rents and not making

22  the payments is just watching it go down the sewer.

23          The same thing can be said for the other houses,

24  really, too.  They have -- they have tried for a year to sell

25  these.  Mr. Levick said they didn't really try to start

1  selling them until November.  You heard that.  And yet they

2  have sold two of them in July before that.  So if they

3  weren't really trying to sell them, how come they sold two of

4  them in July?  They've been trying to sell them for going on

5  a year.  And there's a complete false statement.

6        The only reason we objected to the sale of these houses

7  was because of the issue of community property.  But once

8  that was resolved, it's my recollection that we, you know,

9  we're not objecting to it.  We didn't object to the sale of

10  the Acklin house.

11        So, yes, they're income producing as long as you don't

12  make any payments on them on the mortgage or the taxes.  So

13  they really are income producing in that sense to the

14  Trustee.

15        The motion calls for abandoning the house and returning

16  the money collected in rent on these houses which would be

17  applied towards the payments so that they would be -- so we'd

18  be able to keep the houses.  They never -- these houses never

19  should have been held hostage for all this period of time and

20  just collected the rents and not made the payments on the

21  houses where the lenders have secured liens and they should

22  have been paid with the money that's coming in.  So the

23  request here is to return the houses via abandonment and

24  return the money that was collected in the rents so that the

25  payments, and taxes, and insurance, and things can be paid.

1     I'm finished.

2               MR. LEVICK:  Your Honor, I want to clarify one

3     thing on the record.  When we agreed to abandon effective

4     today the Streams Way house, we're not agreeing to abandon

5     the rents that we've received on that property, Your Honor.

6               THE COURT:  All right.

7               MR. LEVICK: And if the Court requires, I mean,

8     I don't know if the Court -- I mean, if Mr. Jacobsen is

9     through, I would argue he hasn't met any sort of burden under

10    Section 554.  But if the Court requires, I know we have --

11    we're into the lunch hour, but we have a couple of witnesses

12    if the Court would like to hear them.

13              THE COURT:  You can make a short record.

14              MR. LEVICK:  Okay.  I will call Michael Crane

15    to the stand.

16                    (The witness was sworn by the Court.)

17                    MICHAEL CRANE

18    The witness, having been duly sworn to tell the truth,

19    testified on his oath as follows:

20                    DIRECT EXAMINATION

21    BY MR. LEVICK:

22        Q.   Please state your name for the record.

23        A.   Michael Crane.

24        Q.   Are you the broker employed by Chris Moser in this

25    case?

1    A.   Yes.

2    Q.   Do you recall a hearing that we had approximately a

3 year ago to employ you in this matter?

4    A.   Yes.

5    Q.   And do you recall giving any testimony about short

6 sales and -- what was your collection about your short sale

7 testimony at the hearing?

8    A.   Especially in this climate, the short sales are

9 actually beneficial to everyone involved.  Because these

10 lenders don't want the properties back.  They would prefer

11 not to foreclose on them.  And they are more than happy to

12 work out some degree of a carve out for the Trustee.  It does

13 vary, but it usually -- it is a significant amount that they

14 allow the Trustee to have for its unsecured creditors.

15    But the short sale program that we've been doing now

16 for about five years has been very successful.  And other

17 than that, I can just say it's a mutually beneficial program

18 for all of the parties.

19    Q.   Mr. Crane, have you been able to accomplish a short

20 sale in this case?

21    A.   Yes.

22    Q.   And which property was that?

23    A.   Actually, Sky Harbor is the first one and the other

24 one was Acklin.  And I refer to just the street names.

25 That's how I referring to those.

1    Q.   And which one of those was the short sale?

2    A.   To the best of my recollection, Sky Harbor was.

3    I'm not 100 percent sure about Acklin.  I think Acklin may

4    have not been a short sale, There was enough equity, I

5    believe, in that to pay the rents.

6    Q.   Do you remember what those sales generated to the

7    estate?

8    A.   Again, my recollection is that Acklin was

9    approximately $10,000 to the estate and Sky Harbor was

10   approximately 7,000.  And I admit, I don't have those right

11   in front of me to see the settlement statements, but I

12   believe that is close.

13   Q.   And let's talk about the motion to sell that we

14   filed on Appalachia yesterday.

15    Who is the proposed purchaser?

16   A.   It's a lady named Susan Romans.

17   Q.   And do you have other people still interested in

18   the property?

19   A.   Two other back-up buyers and literally last evening

20   at approximately 9:00 a gentleman left a message on my voice

21   mail saying that he was prepared to pay 124 to 125,000 for

22   it, which is approximately 3 to 4,000 more than the amount in

23   the motion.  Therefore, we would probably -- if we do get an

24   objection to the sale, we would come and have an auction and

25   hopefully gain more for the estate out of that auction.

1    Q.    So with your negotiations with the first and second

2  lien holder have mentioned the estate receiving no less than

3  3, are you confident or optimistic the estate could receive

4  as much as 8, 9 or even more than $10,000?

5    A.    I would say, yes.  Probably 8 to 10 would be

6  reasonable to expect.

7    Q.    Okay.  Were you hampered at all before this

8  stipulated judgment was entered into trying to sell these

9  four remaining houses?

10    A.    Yes.  In the early stages of attempting to market

11  them due to the ownership question as far as Ms. Malikyar's

12  ownership of these and the way the title companies would view

13  that, it was so uncertain that we couldn't proceed with any

14  purchasers because of ownership issues.

15    Q.    On Sailmaker, tell me what you think about

16  Sailmaker.  I know it's -- the scheduled debt is about 133.

17  What's going on with the Sailmaker property?

18    A.    Again, the odds of us selling that are very good.

19  But the tax value on the house is about 183,000, I believe,

20  if my memory is correct.  And we feel confident that we will

21  get an offer that will probably pay off the first lien in

22  full.  So that would probably have equity.

23    Q.    Okay.  And so Sailmaker should generate money for

24  the estate?

25    A.    Yes.

1      Q.    Do you have interest in Sailmaker?

2      A.    Yes.  We have had many people look at it.  And for

3    varying reasons, it's just been tough sometimes in this

4    market to -- you know, with as many houses that are for sale,

5    to sometimes get someone to focus on it.  But we have had a

6    lot of interest in it and I feel confident we will get it

7    sold before we -- before it would be foreclosed.

8      Q.    But that property is in good shape?

9      A.    Yes.  And it's occupied by a couple that keeps it

10    up well.

11      Q.    Let's talk about the Snows Hill property.

12          Is there also a tenant there?

13      A.    Yes.

14      Q.    And the mortgage company is Saxon, I have on my

15    chart.

16        What's going on with Snows Hill?

17      A.    The -- one of the main reasons for the delay in

18    selling Snows Hill is that the tenant, for whatever reason,

19    has been repeatedly challenging my legitimacy as the broker

20    for the estate, which is clearly -- you know, I am the broker

21    for the estate.  So they've actually been -- the tenant has

22    at times been difficult to work with on the sale.  We've

23    gotten that resolved now by sending them the documents they

24    asked for and we're proceeding to sell the house.

25      Q.    Is there interest in Snows Hill?

1    A.    Yes.  Again, the normal level of interest that

2 people driving around looking for homes call in.  But, yes,

3 we are getting calls on it.

4    Q.    And that would have to be a short sale, correct?

5    A.    That one I'm fairly certain will be a short sale.

6    Q.    But you've worked with Saxon before on short sales?

7    A.    Yes.

8    Q.    And they're amenable?

9    A.    Yes.

10    Q.    And when you've accomplished short sales with

11 Saxon, what's about the average amount of money that's

12 generated into the estate for a short sale?

13    A.    Usually a minimum of 6,500, $7,000 and up.  On a

14 house of that value, which I believe is approximately

15 200,000, probably $10,000 would be the carve out.  But a

16 minimum of 7.

17    Q.    Okay.

18        MR. LEVICK:  Your Honor, I don't have anything

19 further.

20        THE COURT:  Okay.  You may cross-examine.

21        CROSS-EXAMINATION

22 BY MR. JACOBSEN:

23    Q.    Do you have Appalachia in escrow?

24    A.    Sir, we filed the motion to sell, so, yes, we --

25 when you say escrow, maybe I'm not sure what you're saying

1  escrow is.

2       Q.   Have you opened escrow?

3       A.   Yes.  We've got a title company that's opened a

4  title file on it, yes.

5       Q.   Okay.  So you have an escrow number and everything?

6       A.   It's open.

7       Q.   What's opened?

8       A.   If it -- again, the title company has prepared the

9  documents.  Whether they have opened the file on it, I can't

10 say because I don't know if they have or not.

11      Q.   It's my understanding that it's very recent that

12 you did thing, like how many days ago?

13      A.   The motion to sell was filed, I guess, yesterday,

14 did you say?

15               MR. LEVICK:  Yes.

16      A.   I don't have a copy of the motion to sell, but I'm

17 assuming it was filed yesterday.  But the case -- the attempt

18 to sell the house has been certainly, you know, before

19 yesterday.  We've been marketing the house, so the title

20 company has been working with us on the file for a while.

21      Q.   So right before this hearing to abandon an offer

22 mysteriously appears somewhere.

23       How much is the offer for?

24      A.   The one filed was $121,200.  That was the one that

25 was filed in the motion.  It's always open to higher offers.

1  And last evening I had a phone call, I mentioned, that -- the

2  buyer said between 124 and 125 he would be willing to pay.

3  We don't know that yet, but we have filed one that is 121.2.

4       Q.   That property was purchased for, I don't recall

5  exactly, but like around 150,000.  And so right before this

6  hearing you come up with a quick offer for 124,000?

7       A.   No.

8            MR. LEVICK:  Objection.  I don't know if

9  there's a question in there.

10            THE COURT:  Yeah.

11       Q.   You stated that before November that it was

12  difficult to sell because of ownership problems and dealing

13  with the title company.

14        Didn't you sell two houses prior to that?

15       A.   I believe we did.  And I don't remember if those

16  were in your name or your wife's name.  I just don't recall

17  which ones.  But, yes, I believe we sold two of those.  And

18  the dates are roughly July, that's probably the case.  But I

19  don't know who was on record as the owner for those houses.

20       Q.   So there wasn't a title problem with either of

21  those houses, was there?

22       A.   I don't know.  I just can't recall  the details of

23  the title.  I don't know who was on record.  I don't know who

24  was the title owner, but we did get them sold to the benefit

25  of the creditors, unsecured creditors.

1      Q.   Well, I can tell you one house was mine and one was

2    my wife's.  But when I say there was no title problem, they

3    closed and there's title insurance for the new owner and

4    there was no particular problem, correct?

5      A.   I would say the one that was in your name, probably

6    not.  The one that was perhaps in your wife's name, I would

7    have to go back and just look if there was any problem with

8    the title company you brought up or whether we had to remedy

9    that some way.  I honestly don't remember the details of

10   whether the title company had any issues at the time of the

11   closing or not.

12     Q.   What would be the title issues that would be a

13   problem?

14     A.   Title issues would certainly be a result of whether

15   it was affected by the bankruptcy or not, meaning if your

16   wife a non-filing spouse and the estate only owned half of

17   that house rather than it being community property where they

18   owned 100 percent, that is where the title problems

19   originate.  Because if it's owned 50 percent, obviously you

20   need certain cooperation with the non-filing spouse.  If it's

21   community property, they can sell her interest along with

22   that.  But that's the only reason.  When there is any other

23   dispute over the ownership name of the house like that, it

24   just brings up intrinsic title problems because you have to

25   make sure that you're conveying title free and clear.

1     Q.    And there were no problems, they went through free

2  and clear?

3     A.    I assume they did.

4     Q.    You mentioned Sailmaker, your words were, Maybe

5  enough money would come out of the sale to pay off the first.

6  That's my -- I wrote them down as you said it.

7     A.    In other words, there's a possibility that we may

8  get enough for that one that it would cover the liens that I

9  am aware of right now on the property.  I don't have the

10  title report in front of me, but if the first lien is the

11  only lien, or if there's two liens, I'd have to see which

12  ones you're referring to.  But it appears there's equity in

13  the property above the mortgage liens.

14     Q.    So maybe you'd get a little bit of money?  You've

15  had that house -- you've been actively trying to sell that

16  house along with Sky Harbor and Acklin, but you did sell

17  those, since, what, May of last year?

18     A.    Again, I'm sorry, I don't remember when that one

19  would be, quote, on the sale list, or whatever.  But it's

20  probably roughly the same time frame.

21     Q.    So it's been about a year it's been on the market?

22  And that would be true for all of the houses that you have,

23  all of the Collin County houses; is that correct?

24     A.    They were part of the estate when I was hired as

25  the broker.  But I would not say that all of the houses were,

1  quote, in saleable shape at the time due to the previous

2  things I just mentioned about the ownership issues.  And keep

3  in mind that the short sale program that Mr. Levick asked

4  about earlier is a benefit to creditors that the secured

5  creditors, these mortgage companies, that have repeatedly

6  approved these deals because it is better for them to let me

7  sell the house and they're happy to give a carve out to the

8  bankruptcy estate.  So the creditors are not objecting to any

9  of this.  They're fully agreeing to it.  And they're allowing

10  us to sell these because of the benefit to them also.

11     Q.   If my wife and I were to keep these houses, the

12  lenders loan amount would remain the same.  And when the

13  houses are eventually sold when the market improves, they

14  would get all of their money.

15     So how would you coming along and saying, Well, I'll

16  give you less than all of what's owed, how would that benefit

17  them over us getting the property back?  They would get all

18  of the money if they got it back -- if retained the property.

19              MR. LEVICK:  I'm going to object.  That

20  assumes some facts that are not in evidence.

21              THE COURT:  Sustained.

22     Q.   How does it benefit the lender to accept less than

23  what's owing?

24     A.   Honestly, I'm not in a position to state why a

25  lender would view that as a benefit, they do.  And so I'm not

 1  going to speak for the lender.  I don't know why they view

 2  that.  They must have reasons in their own internal

 3  operations that make these beneficial to them because they

 4  approve them.  Along with a sizeable payment to the Trustee

 5  on each of these sales.  A significant payment.

 6       Q.   How long have you been practicing real estate?

 7       A.   Since 1983, I was a broker, and two years prior to

 8  that.

 9       Q.   So a long time?

10       A.   A long time.

11       Q.   You've been at it for a while.

12        What is your understanding of a lender's willingness to

13  accept a short sale in conjunction with the status of the

14  payments on the house?  And let me clarify that.  When I say

15  status on the payments, I mean the options are the payments

16  are completely current, or the payments are month behind.  Or

17  the third would be, they're so far behind the lender has

18  actually filed a notice of sale.

19        What is your understanding of a lender's willingness to

20  accept a short sale under those conditions, those three

21  different conditions

22       A.   Again, I mean, you're asking me to speak for a

23  lender, and I just --

24       Q.   No, I'm not.  I'm asking -- you've been in real

25  estate a long time and doing these.  What is your

1    understanding?

2            MR. LEVICK:  I'm going to object.  I think

3    this goes beyond the scope of my direct.

4            THE COURT:  Overruled.

5       A.    The -- the lenders' temperament varies for many

6    reasons.  It could be the current market conditions, whether

7    or not they view that recovering the property is something

8    that would benefit them.  In other words they're going to go

9    through an expense of foreclosure, attorney's fees, any other

10   attendant costs that would go along with recovering the

11   property.  And they weigh that against the benefit of the

12   Trustee selling it and just having that sort of off their

13   books at that point.  They've resolved it.  They've looked at

14   it.  They've scrutinized every deal we submit to them.  So to

15   answer your question, their individual temperament based on

16   the conditions you just outlined, I have no idea why a lender

17   at any given point in time would say they would agree to do

18   it.

19          There are instances where they don't.  If they view

20   that there's a lot of value to them and they don't want to do

21   it, they may not.  But I find a large number of these deals

22   are approved that are otherwise, quote, non-equity

23   properties.  Even if there's no equity, the property lenders

24   allow us to sell them and allow a carve out for the estate

25   that is sizeable, usually between 7 to $10,000 per asset, if

1   that answers your question.

2       Q.   I'm going to ask it a different way, because it

3   doesn't really answer my question.

4        Have you ever approached a lender for a short sale

5   where the payments are completely current on the house?

6       A.   Yes.

7       Q.   And have you had the lenders be reception to a

8   short sale where the payments are current?

9       A.   Yes.

10      Q.   Have you approached a lender for a short sale where

11  the payments are completely current and the house is worth

12  more than the loan amount and have them accept a short sale?

13      A.   I wouldn't approach them for a short sale if it was

14  worth more than that.  I would have sold it and just paid off

15  the first lien -- well, when I say I, there would have been

16  proceeds sufficient to pay off the first lien, so we wouldn't

17  have approached them on that one.

18      Q.   You mentioned a lender's incentive to accept a

19  short sale as being -- one reason was that they would not

20  have to go through the foreclosure process which is

21  expensive; is that correct?

22      A.   I don't know how expensive it is.  But that would

23  be one of the reasons they would prefer not to take the

24  property back, whether it's the expense or the liability once

25  they own the house, whatever their reasons are, they find it

1  preferable to allow the Trustee to sell the house rather than

2  them taking it back in a foreclosure.  Again, I can't speak

3  for their modifications.  I just know that they've approved

4  these.  When we have submitted the documents they asked for

5  and come back and said, We'll approve the sale.

6      Q.   Is it your understanding, then, that if the

7  payments are completely current on a house, they're less

8  receptive to accepting that?

9      A.   I didn't say that.

10     Q.   No.  I'm asking you now.

11     A.   I would -- it's total speculation.  I have no idea

12  whether they would or wouldn't.  I know that I've done sales

13  on  houses that were completely current and they've accepted

14  less than the debt on them.  Yes, I've had instances like

15  that.

16     Q.   When did you place your signs in front of these

17  houses?

18     A.   You know, date wise, I just don't know.  I would

19  say it was in -- normally once the houses are determined to

20  be ready for sale.  And that could be everything from do we

21  have current keys.  I typically have to go check the houses

22  out to make sure we have access.  I have to see many things

23  about the house before we can put it on the market.  So

24  assume 30 days or so after I probably got the case, I would

25  say, roughly.  And I'm talking about getting the case when

1   Mr. Moser employed me.  I would say roughly 30 days after

2   that I would probably have started working on some of it.  I

3   don't remember because of these other lien -- not lien

4   issues, but the ownership issues between your wife and

5   yourself on who owned them.  Some of them I did not stop

6   marketing until much further into the calendar because of

7   those issues.  I knew that we had ownership questions that we

8   weren't clear on and I wasn't going to stop marketing a house

9   that I didn't know I could sell.

10      Q.   Have you shown the Snows Hill house to any

11  perspective buyers?

12      A.   Yes.

13      Q.   When was the most recent showing?

14      A.   It was a long time ago.  We've been having -- as I

15  mentioned, the tenant in that house has been quite a bit

16  difficult to deal with.  And seemingly -- and this is just my

17  personal interpretation is, they have been willingly trying

18  to stop me from selling that house.  So I'm challenging my

19  legitimate -- legitimacy as the broker.  And not being there

20  when someone needs to come by and see the house, or whatever.

21  There have been a number of reasons why that one has been a

22  little bit of a delay.  But, yes, I have shown it before.

23  And at this point we don't have a working offer on it, but I

24  feel that we will very soon.

25               THE COURT:  Mr. Jacobsen, you get two more

1    minutes.

2                 MR. JACOBSEN:  Okay.

3        Q.    Have you shown the Springs Way house recently?

4        A.    Not recently.

5        Q.    Have you shown the Appalachia house recently?

6        A.    Yes.

7        Q.    Have you shown -- what's the other one -- the

8    Sailmaker house?

9        A.    Yes.

10       Q.    Have you represented houses for Trustee's for a

11   long time?  How many years?  Five?  Six years?

12       A.    5 or 6 years.

13       Q.    You sound knowledgeable, that's why I asked.

14                 MR. JACOBSEN:  I think I'm finished with my

15   questions.

16                 THE COURT:  Anything further?

17                 MR. LEVICK:  Nothing, Your Honor.

18                 THE COURT:  Okay.  All sides rest -- you may

19   step down.  All sides rest and close on evidence?

20                 MR. LEVICK:  Yes, Your Honor.

21                 THE COURT:  Mr. Jacobsen?

22                 MR. JACOBSEN:  The only other thing I can

23   think of is Mr. Levick has made numerous calls to me trying

24   to get me to agree to whatever the motion is that he's

25   fighting with me on.  And in some of these calls he's

1   been -- he calls without my attorney present.  I don't have
2   an attorney now.  But back when I had an attorney, he'd make
3   his calls directly to my home and pressured me into trying to
4   make decisions.  Actually making out in out threats.
5              MR. LEVICK:  Your Honor, I'm going to object.
6    I have never done such a thing.  When he was represented by
7   counsel, I went through his counsel.  And we heavily
8   negotiated a respective settlement that Mr. Jacobsen reneged
9   on.  And Ms. Lindauer, who was his counsel, can come in and
10  testify to the many hours that Ms. Lindauer and I spent in my
11  office trying to resolve all of these issues.
12         So, no, That's not true.  He was represented by
13  Ms. Lindauer and I went through Ms. Lindauer.  Before that,
14  Mr. Rossini.   I don't know how that's relevant.
15             MR. JACOBSEN:  You have never called me
16  directly?  That's a question.
17             MR. LEVICK:  I'm not on the stand.  And I
18  haven't --
19             MR. JACOBSEN:  Can I put Mr. Levick under
20  oath, please?
21             THE COURT:  You can.  But you only have two
22  minute with him.  And he can testify from where he is.  But
23  get on that microphone, Mr. Levick.
24         Let's have you sworn.
25             (The witness was sworn by the courtroom deputy.)

1          <u>LARRY LEVICK</u>

2    The witness, having been duly sworn to tell the truth,

3    testified on his oath as follows:

4              <u>DIRECT EXAMINATION</u>

5    BY MR.JACOBSEN:

6        Q.    Have you ever called me directly without me having

7    my attorney present?

8        A.    Yes.

9        Q.    How many times?

10       A.    Well, I'm going to tell you --

11             THE COURT:  Mr. Jacobsen, you're going to have

12   to stand by a microphone.

13       A.    It was the time that was the subject of the order

14   to show cause.  I was supposed to give notice to South Shore

15   Capital of the hearing and I asked, Mr. Meyer, Who's the

16   attorney representing South Shore Capital since you're

17   withdrawing?  They need to come to this status conference.

18   And he gave me the number and I called and it happened to be

19   you because you were the person impersonating South Shore

20   Capital.  That was the subject of the whole order to show

21   cause.

22       The other time that we talked, Mr. Jacobsen, is when

23   you were calling Mr. Moser on an emergency basis saying that

24   your lawsuit against the Srameks was about to be dismissed

25   and why she filed certain things with the Court.  And you

1  wanted someone to call you back.  So I called you back to

2  discuss what we could do to prevent the Sramek case from

3  being dismissed.  Those are the only times I recall talking

4  to you without your attorney present.

5       Q.   You don't recall calling me in the middle of July

6  to influence me into allowing the sale of the Acklin house

7  and the Tice Valley house?

8       A.   No.  I did not do that.

9            MR. JACOBSEN:  Your Honor, I have a copy of my

10  phone bill showing his calls to me.  This will show that he's

11  lying.

12            THE COURT:  Okay.  Are you finished with this

13  witness?

14       All right.  You're finished with this witness.

15       Mr. Jacobsen, I have the impression right now that

16  you're just enjoying being in front of that microphone.

17  You've had your day in court.

18       So the debtor's motion for abandonment is denied as to

19  the Appalachia house and other properties.  The Trustee does

20  not have to pay to debtor any rents received during the

21  pendency of the done.

22       The debtor has failed to prove the properties are

23  burdensome or of inconsequential value or benefit to the

24  estate.  We stand adjourned.

25                      (End of Proceedings.)

1                    C E R T I F I C A T E

2              I, CINDY SUMNER, do hereby certify that the

3    foregoing constitutes a full, true and complete transcription

4    of the proceedings as heretofore set forth in the

5    above-captioned and numbered cause in typewriting before me.

6

7

8

9

10

11

12

13

14                                   /s/Cindy Sumner
                                   _____
15                                   CINDY SUMNER, CSR #5832
                                   Expires 12-31-09
16                                   National Court Reporters
                                   16 Gettysburg Lane
17                                   Richardson, Texas 75080
                                   214 651-8393
18                                   Firm #417

19

20

21

22

23

24

25