

09/30/2009

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ROBERT EDWIN JACOBSEN, | § | Case No. 07-41092 |
| | § | (Chapter 7) |
| Debtor. | § | |

## MEMORANDUM OPINION

On August 22, 2008, this Court issued a *sua sponte* Order requiring Robert Jacobsen, Laurie Share, and South Shore Capital, Inc., among others, to show cause why they should not be sanctioned pursuant to 11 U.S.C. § 105(a), 28 U.S.C. § 1927, Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 9011, or the Court's inherent power for their actions in connection with a motion by the Chapter 7 trustee to sell certain residential real property. The Court conducted a hearing on January 14 and 16, 2009, at which time the parties presented arguments and evidence. The Court, having considered the record of this case and evidence presented at the show cause hearing as well as prior related hearings, makes the following findings of fact and conclusions of law.[1]

## BACKGROUND

Robert Jacobsen described himself and his non-bankrupt spouse as self-employed real estate investors in his sworn bankruptcy schedules. His original bankruptcy schedules listed his ownership interest in a homestead in Frisco, Texas, and two real properties in Plano, Texas. As discussed in this Memorandum Opinion, these statements were materially false. Jacobsen's interests in real estate far exceeded those interests disclosed in his original bankruptcy schedules. Jacobsen's desperate attempt to prevent

---

[1] To the extent any finding of fact is constructed to be a conclusion of law, it is hereby adopted as such. Likewise, to the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

the liquidation of these interests through the filing of sham pleadings in this Court led to the show cause hearing that is the subject of this Memorandum Opinion.

The details of Jacobsen's business ventures emerged over the course of several hearings. The Court begins its background discussion with a distillation of the events preceding Jacobsen's petition for relief in this Court. The Court then discusses Jacobsen's bankruptcy case, focusing on attempts to sell a parcel of residential real property referred to by the parties as the "Tice Valley Property."

### A. The Events Preceding Jacobsen's Personal Bankruptcy

Robert Jacobsen and Alise Malikyar married in 1999. Jacobsen is a licensed real estate broker, and Malikyar, who was born in Afghanistan, has been employed as a hair stylist. During their marriage, Jacobsen and Malikyar acquired numerous real properties, including the Tice Valley Property, which is located in Walnut Creek, California. Jacobsen has testified that his wife is a sophisticated real estate investor. However, Malikyar testified at a hearing on July 16, 2008, that she does not know much about real estate and that her husband helps her with "all those things."

Jacobsen and Malikyar resided in the Tice Valley Property from 1999 until approximately December 2005. Malikyar testified at the hearing on July 16, 2008, that Jacobsen negotiated a purchase price of approximately $750,000. Malikyar testified that she borrowed funds from Jacobsen in order to purchase the home. Malikyar did not produce any documentation of the alleged loan from her husband, which appears to have been unsecured. The parties have represented to this Court that the Tice Valley Property was titled in Malikyar's name.

2

The Tice Valley Property appears to have been unencumbered by any liens following its purchase by Jacobsen and Malikyar. Malikyar subsequently executed several short form deeds of trust in favor of Wells Fargo Bank, N.A. ("Wells Fargo") pursuant to which she and/or Jacobsen obtained sums of money secured by the Tice Valley Property. Each of the short form deeds of trust falsely described Malikyar as an unmarried woman.

In or around the summer of 2004, Jacobsen and Malikyar purchased a yacht called the Illusion III. This purchase was part of a confusing series of transactions among corporate entities, and those transactions have led to several lawsuits among the parties. Jacobsen testified at a hearing on November 21, 2007, that he purchased the yacht and obtained what he described as "operating income" by borrowing $990,000 from Osprey Investment Corporation ("Osprey"). Jacobsen testified that his repayment obligation to Osprey was unsecured. Jacobsen did not introduce any documentary evidence of this alleged loan agreement with Osprey or any documentary evidence that he actually received $990,000 from Osprey.[2]

Jacobsen testified at the hearing on November 21, 2007, that he transferred the $990,000 he received from Osprey into an account belonging to one of his businesses, REJ Properties, Inc., and then used approximately $720,000 of the funds to purchase all of the stock of the British American Yacht Corporation.[3] The only asset of the British

---

[2] Notably, the documents attached to a motion for summary judgment filed by Jacobsen in an adversary proceeding brought against him by John and Bernadette Sramek, individually and as trustees of the Sramek Revocable Living Trust (collectively, the "Srameks") include a document entitled "Straight Note." The "Straight Note" is dated May 21, 2004, is signed by only by Jacobsen, and states that Jacobsen will pay Osprey $1,241,856 on or before May 20, 2006.

[3] A copy of a state court complaint filed by the Srameks, among others, against Jacobsen, among others, was introduced at a hearing on September 27, 2007. The Srameks allege in the complaint that Osprey was created at or about the time that REJ Properties, Inc. borrowed $1,250,000 from Osprey. The

American Yacht Corporation appears to have been the Illusion III. Jacobsen testified that he and his wife each had a 50% interest in the British American Yacht Corporation and that he was its president.

It is not clear from the record who owned the British American Yacht Corporation and the Illusion III prior to Jacobsen's alleged purchase of all of its stock. Jacobsen testified that he and Malikyar spent some time enjoying themselves on the yacht in the Caribbean beginning in the summer of 2004 through the summer of 2006. According to Jacobsen, they hoped to start a charter business but discovered after purchasing the yacht that they were not properly licensed to do so.

In October 2004, Malikyar executed documents pursuant to which she and/or Jacobsen borrowed $746,250 from GreenPoint Mortgage Funding, Inc. ("GreenPoint"). In particular, on October 15, 2004, Malikyar executed an Adjustable Rate Note and Deed of Trust in favor of GreenPoint. Malikyar testified at a hearing on April 18, 2008, that she obtained this loan to repay her husband for the funds he had advanced to her for the purchase of the Tice Valley Property. There was no documentary evidence supporting Malikyar's testimony about how she used the proceeds of the loan from GreenPoint or that the alleged loan from Jacobsen has been satisfied.

Perhaps the most mysterious player in this drama is a company calling itself Coast Capital Ltd. ("Coast Capital"). According to Jacobsen's testimony on November 21, 2007, and at the subsequent show cause hearing, Malikyar obtained an "equity line" of

---

Srameks allege that this loan was secured by certain real property which Jacobsen had conspired to overvalue by obtaining an inflated appraisal. They allege that they paid Osprey $1,000,000 for an assignment of the note and deed of trust, as amended, executed by REJ Properties, Inc. in favor of Osprey. The Srameks allege that Osprey paid Jacobsen a "commission" of $10,000 and transferred $990,000 to REJ Properties, Inc. The Srameks further allege that Jacobsen and Alberson, the president of Osprey, have been friends for nearly thirty years.

credit in the amount of $1.2 million from Coast Capital in or around June 2006. According to the documentary and testimonial evidence, Coast Capital appears to have been formed in the spring of 2006 under the laws of Belize. The name that appears on most of the documents relating to Coast Capital is Gregorio Alvizuri Ramirez.

Jacobsen testified that Malikyar agreed to mortgage five lots located in Lake Tahoe, California, and the Tice Valley Property, each of which was titled in her name, to Coast Capital in exchange for the equity line from Coast Capital. In addition, Jacobsen testified that he, as president of British American Yacht Corporation, and Malikyar as the co-owner of British American Yacht Corporation, pledged the yacht as security for the equity line from Coast Capital. According to Jacobsen, no payments were due to Coast Capital until the pledged properties were sold. Coast Capital was to accrue interest at the rate of 12%, computed on a monthly basis, pending the sale of any of the pledged properties.

Jacobsen testified that his wife used the equity line to repay his personal obligation to Osprey. Jacobsen did not produce any documentary evidence supporting his testimony about how the alleged loan proceeds were used or, as previously discussed, any documentary evidence regarding the terms of the $990,000 loan he had allegedly received from Osprey. Jacobsen testified that his obligation to Osprey had come due or was about to come due in or around June 2006. Jacobsen further testified that he had not previously made any payments on his obligation to Osprey, which had been accruing interest at the rate of 12% per annum.

Significantly, Malikyar was unable to explain the "equity line" she received from Coast Capital during her testimony on July 16, 2008. She testified, credibly, that the loan

from Coast Capital was explained to her by her husband and that she signed the documents that she was presented. When asked why she pledged property she held in her own name, and that she claimed was her separate property under California law, to satisfy a personal obligation of her husband, she responded: "I help him, he help me."

Jacobsen testified at the show cause hearing and at the prior hearing on November 21, 2007, that he sold the yacht in June 2006 in exchange for $5,000 and the assumption by the purchaser of the debt to Coast Capital relating to the yacht.[4] In April 2007, less than 30 days before Jacobsen filed for bankruptcy, a payment of $429,490.94 was allegedly made to Coast Capital and credited against Malikyar's equity line. Jacobsen testified that "it probably came from the sale of the boat" by the individual who had purchased the yacht from him. Jacobsen testified that he did not know the sales price of the yacht but that he believed he had originally paid too much for it.

Jacobsen testified at a hearing on November 21, 2007, that he had at one time owned the five lots in Lake Tahoe that Malikyar pledged to Coast Capital. He testified that he sold the lots in exchange for a note and that his wife subsequently purchased the lots pursuant to a foreclosure sale. Jacobsen's testimony about his wife's acquisition of the five lots was vague and unclear. Jacobsen testified that his wife sold the lots to a single buyer approximately one year prior to his bankruptcy and that the sale was credited against the amount owed by his wife to Coast Capital.

The Lake Tahoe lots have another connection to the mysterious Coast Capital. At the show cause hearing on January 14, 2009, Laurie Share, who now claims to hold Coast Capital's lien on the Tice Valley Property through one of her businesses, testified that she

---

[4] Jacobsen refused to elaborate on this transaction because he had allegedly signed a confidentiality agreement with the purchaser. The only evidence of such an agreement was Jacobsen's testimony.

6

purchased several lots in Lake Tahoe from or through an individual named Larry Harmon in or around April 2008. Jacobsen is acquainted with both Share and Harmon -- Jacobsen testified that he had previously attempted to broker the sale of some of Share's property to Harmon. Share testified that she was aware that the Lake Tahoe lots had previously been owned or controlled by Jacobsen or one of his entities.

Approximately one month prior to Jacobsen's personal bankruptcy, Malikyar signed documents for the purchase of another home referred to by the parties as the "Bella Vista Property." Malikyar also signed documents transferring the Bella Vista Property, which is located in California, to the Sky Harbor Land Trust. Jacobsen and his wife were residing together at the Bella Vista Property at or around the time that Jacobsen filed a bankruptcy petition in this Court. Jacobsen testified at the hearing on November 21, 2007, that he believes the beneficiary of the trust is a cousin, Ken Burton, who lives in Oslow, Norway.

Jacobsen was attempting to sell the Tice Valley Property when he filed for bankruptcy protection. He was also managing seven residential real properties located in Texas, which were titled in Malikyar's name. Jacobsen testified at a hearing on November 21, 2007, that the rental proceeds were deposited into a joint bank account, which he also managed. Jacobsen also testified that Malikyar was paying him several thousand dollars each month for his work repairing and improving the Bella Vista Property. However, at the hearing on November 21, 2007, Jacobsen testified that his wife had no income for 2005, 2006, or 2007 until she started doing hairstyling again after he filed for bankruptcy protection in 2007.

## B. Jacobsen's Chapter 13 Petition

Jacobsen initiated this case by filing a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on May 25, 2007.[5]   Jacobsen stated in his petition and in hearings before this Court that he lived in a home in Plano, Texas during the months preceding bankruptcy.  Jacobsen testified on November 21, 2007 that, shortly after filing his bankruptcy petition, he returned to California to live with his wife.

Jacobsen did not disclose any of the properties titled in his wife's name in his bankruptcy schedules or the income he was receiving for managing his wife's properties. According to Jacobsen's testimony on November 21, 2007, he had informed his bankruptcy attorney that he and his wife were separated.  The instructions for Bankruptcy Schedule I – Current Income of Individual Debtor(s) states that the portion describing a non-filing spouse's income must be completed "unless the spouses are separated and a joint petition is not filed."  *See* Official Form 6I (12/07).  Jacobsen clarified at that hearing that he and his wife were not suffering marital difficulties but were simply living in different homes when he filed his bankruptcy petition.[6]

---

[5] Jacobsen was previously involved in bankruptcy proceedings on behalf of companies in whose name he has done business.  These bankruptcies include a Chapter 11 petition filed by Jacobsen for REJ Properties, Inc. in the United States Bankruptcy Court for the Northern District of California on September 7, 2005, denominated Case No. 05-4505-J; and a Chapter 11 petition filed by Jacobsen for REJ Properties, Inc. in the United States Bankruptcy Court for the District of Nevada on March 13, 2007, denominated Case No. 07-11280.  The first bankruptcy of REJ Properties, Inc. was dismissed for bad faith based on a motion by the United States Trustee.  The second bankruptcy was transferred to the Northern District of California based on a motion by the Sramaks.  The bankruptcy court for the Northern District of California subsequently dismissed the second case and granted a motion by the Sramaks for sanctions against counsel for REJ Properties, Inc. on the grounds that counsel filed the bankruptcy petition in violation of Federal Rule of Bankruptcy Procedure 9011.  *See In re REJ Properties, Inc.,* 2007 WL 2914904 (Bankr. N.D. Cal., Oct. 5, 2007) (discussing the prior bankruptcy of REJ Properties, Inc. and awarding sanctions).

[6] In his Statement of Financial Affairs (Official Form 7), Jacobsen did not disclose transfers relating to his wife's property during the two years prior to bankruptcy, and he did not disclose any income for his wife from 2005 through the filing of his petition in 2007.  Jacobsen stated that his own income during those years came from the lease of property owned by him.  In his original bankruptcy schedules, Jacobsen stated that his regular income as a "real estate investor/manager" was $11,733.  In contrast to his Statement of Financial Affairs, Jacobsen stated in his bankruptcy schedules that his wife's monthly income from real

Jacobsen and Malikyar testified at the show cause hearing that they had entered into a prenuptial agreement providing that after-acquired property was to remain each spouse's separate property.  Jacobsen and Malikyar also testified that they had entered into a supplemental, post-nuptial "marital agreement" dated September 1, 2001, which listed the Tice Valley Property as Malikyar's separate property.  Neither of these documents was notarized or filed in the real property records for the Tice Valley Property.  Jacobsen testified that he provided copies of these documents to his bankruptcy attorney at some point after he filed his petition for relief in this Court.

When Jacobsen filed for bankruptcy, he was engaged in civil litigation in a lawsuit brought by John and Bernadette Sramek, among others.  The Srameks are listed on Jacobsen's Schedule F as unsecured creditors possessing a disputed, contingent claim of $1,627,536.38.  The Srameks' claims against Jacobsen were the subject of a litigation styled *John S. Sramek, et al. v Robert E. Jacobsen, et al.*, pending in the Superior Court of Contra Costa County, California at No. C-06-00162, in which the Srameks asserted, among other claims, that Jacobsen defrauded them in a real estate transaction.

In addition to the pending litigation between the Sramaks and Jacobsen, Malikyar filed a *pro se* suit against the Srameks in federal district on or about June 11, 2007, under the civil wiretap statute, 18 U.S.C. § 2511 *et seq.*[7]  Jacobsen did not disclose this claim in his original bankruptcy schedules.[8]  Malikyar alleged in the complaint that she was a Texas resident.  According to Malikyar's complaint, Jacobsen was attempting to sell the

---

property was $11,132.38.  Jacobsen did not disclose in his schedules that any portion of his wife's alleged income was being used to pay him for "managing" several properties titled in her name.

[7] Jacobsen admitted at the hearing that his wife could not have prepared this document herself.  He suggested that a lawyer friend, whose name he could not recall, might have helped her.

[8] Jacobsen filed amended bankruptcy schedules on March 13, 2008.  Jacobsen disclosed the pending wiretap lawsuit in his amended schedules.

Tice Valley Property in April 2007 in order to pay her legal expenses.  *See Malikyar v. Stramek, et al.,* 2007 WL 3343159 at *1.  She alleged that the Srameks obtained confidential information regarding a pending sale by illegally wiretapping the telephone line to Jacobsen's home office.  *Id.*  Malikyar further alleged in her complaint that the Sramaks used this information to place a *lis pendens* on the property and thereby prevent the escrow from closing on April 30, 2007.  *Id.*

On June 20, 2007, the Chapter 13 trustee conducted a meeting of creditors pursuant to 11 U.S.C. §341(a).  At that meeting, Jacobsen disclosed the omission of numerous real properties titled in his wife's name, including the Tice Valley Property, from his bankruptcy schedules.  Jacobsen informed the Chapter 13 trustee that he had located a buyer for the Tice Valley Property and that the Tice Valley Property was proceeding to sale.

On July 27, 2007, the Chapter 13 trustee filed an adversary proceeding against Jacobsen and his wife denominated Adversary Proceeding No. 07-4134.  The Chapter 13 trustee sought, *inter alia*, to enjoin the sale of the Tice Valley Property.  The Court granted the Chapter 13 trustee's request for a restraining order following a hearing on August 3, 2007.  At that hearing, Jacobsen disclosed, for the first time, that he had a non-exempt interest in the Tice Valley Property.

On August 2, 2007, the Chapter 13 trustee filed a motion to convert Jacobsen's case to Chapter 7 of the Bankruptcy Code.  The Chapter 13 trustee alleged that Jacobsen's non-disclosures provided "cause" for the conversion and that, in any event, his debts exceeded the amounts permitted in Chapter 13 cases.  Jacobsen responded on

10

the same day by filing a motion to dismiss his Chapter 13 case.  In addition, on August 8, 2007, Jacobsen filed a motion to sell the Tice Valley Property.

Jacobsen proposed to sell the Tice Valley Property for a gross sales price of $1,290,000.  Jacobsen alleged that the sale would benefit the estate, because he expected to earn a commission of $38,700 from his wife for the sale.  Jacobsen further stated that the proceeds of the sale would be used to satisfy three outstanding mortgages on the home.  Jacobsen specifically proposed to pay Coast Capital $147,182.67 from the sale proceeds in satisfaction of what he described as a second mortgage on the Tice Valley Property.  Jacobsen also proposed to pay an individual named Stacy Adams for an unsecured debt that he had not listed on his bankruptcy schedules.  The Court later learned that that Ms. Adams was the broker with respect to the purchase of the Bella Vista Property.[9]

The Court granted Jacobsen's request for an expedited hearing on his motion to sell the Tice Valley Property.  The expedited hearing was scheduled to be held on August 14, 2007.  The Srameks as well as the Chapter 13 trustee objected to the motion and, in particular, to Jacobsen's proposed distribution of the sale proceeds.  On August 13th, the day before the scheduled hearing, Jacobsen withdrew his motion to sell the Tice Valley Property.

### C. Jacobsen's Chapter 13 Case Is Converted to Chapter 7

The Court began a hearing on the Chapter 13 trustee's motion to convert and Jacobsen's motion to dismiss his case on September 27, 2007.  The parties were unable to conclude their presentation on September 27, 2007, and, therefore, the Court continued the hearing to November 21, 2007.  During the hearing, Jacobsen responded to questions

---

[9] Jacobsen testified regarding Ms. Adams at the hearing on November 21, 2007.

11

about several bank accounts that he had failed to disclose in his bankruptcy schedules and his Statement of Financial Affairs. Jacobsen testified that these accounts may not have been technically closed, but had zero balances. Jacobsen also was questioned about various large transfers of funds from his accounts or accounts under his control during the year prior to bankruptcy.

Malikyar did not testify at the hearing on November 21, 2007, and Jacobsen testified that he knew little or nothing about the property titled in his wife's name or his wife's business ventures. He was unable to recall the many of the details of Malikyar's or his own pre-bankruptcy businesses. He claimed to have no knowledge of the arrangement Malikar had with the Sky Harbor Land Trust regarding the Bella Vista Property where he was living with Malikyar or how she was obtaining the funds necessary to make any required payments to the Sky Harbor Land Trust. He had no recollection of the assets of and transfers made by the Jacobsen Trust, of which he is the sole trustee and beneficiary. He had no knowledge of the current ownership of REJ Properties, Inc., which he testified that he had sold in May 2006 for $1 million in the form of a note.

Jacobsen's memory lapses were designed to obfuscate the record to his benefit in connection with the motion to convert his case to Chapter 7. Jacobsen's memory conveniently cleared with respect to matters connected to the Srameks' claims.[10]   In

---

[10] The Srameks filed a claim against Jacobsen for money loaned to him on May 20, 2004. The Srameks attached several documents to their proof of claim, including a copy of a note in the amount of $1,250,000, which was executed on October 29, 2003, by Jacobsen, as president of REJ Properties, Inc., in favor of Osprey. The note provided that the borrowed amount would accrue interest at the rate of seven percent per annum and would be payable on December 31, 2004. The Srameks also attached a modification of the note dated May 19, 2004, and executed by Jacobsen, as president of REJ Properties, Inc., and Michael Alberson, as president of Osprey, whereby the term was extended to January 31, 2006 and the interest rate was increased to twelve percent per annum for the period from January 1, 2005 to

particular, Jacobsen clearly recalled the $990,000 loan he allegedly obtained from Osprey and his purchase of the British American Yacht Corporation and the Illusion III during the summer of 2004. Jacobsen's memory also cleared with respect to the use of the "equity line" from Coast Capital to make several payments to the Rodelson Partnership, which had allegedly acquired the note.[11] According to Jacobsen's testimony on November 21, 2007, he believes that the general partner of the Rodelson Partnership absconded with the money received from the sale of the pledged property.

At the conclusion of the hearing on November 21, 2007, the Court orally granted the Chapter 13 trustee's motion to convert Jacobsen's case to Chapter 7 over Jacobsen's objection. On December 5, 2007, the Court entered a Memorandum Opinion and Order more fully explaining its decision.[12] Christopher Moser was thereafter appointed as the Chapter 7 trustee of Jacobsen's estate.

At this point, Jacobsen's bankruptcy case became complicated.

### D. Jacobsen's Chapter 7 Case

#### 1. Creditors' attempts to foreclose upon the Tice Valley Property

In late December 2007, the Chapter 7 trustee learned that Coast Capital was attempting to foreclose on its purported interest in the Tice Valley Property. Counsel for the Chapter 7 trustee sent a letter to Carlos A. Olmo dated December 31, 2007, informing him that Coast Capital's actions violated the automatic stay imposed by §362(a) of the

---

January 31, 2006. The modification also states that REJ Properties' obligation to Osprey under the note is secured by certain real property located in Contra Costa County, California.

[11] According to documents attached to a motion summary judgment filed by Jacobsen in Adversary Proceeding No. 08-4048, Jacobsen and Alberson were partners in the Rodelson Partnership, and Thomas Rodriguez was the general partner.

[12] Jacobsen appealed from the Memorandum Opinion and Order. The District Court affirmed the Court's decision. Jacobsen then appealed to the Fifth Circuit. His appeal to the Fifth Circuit remains pending.

Bankruptcy Code.  Counsel for the Chapter 7 trustee believed that Mr. Olmo was the vice president of Coast Capital and so addressed the letter.

On March 31, 2008, the Chapter 7 trustee filed a First Amended Complaint in the pending Adversary Proceeding No. 07-4134.  The First Amended Complaint added Coast Capital as a defendant, among other changes, and asserted the following claims against Coast Capital: (1) Avoidance of Lien of Coast Capital pursuant to §§ 548(a) or 544(b); Avoidance of Lien pursuant to §547(b); (3) Accounting from Coast Capital; (4) Avoidance and Recovery of All Fraudulent, Preferential and Unauthorized Post-Petition Transfers to Coast Capital; (5) Violation of Automatic Stay by Coast Capital; and (6) Permanent Injunction.  The Chapter 7 trustee was unable to effect personal service on an officer or director of Coast Capital.

On March 27, 2008, the Chapter 7 trustee filed a motion seeking to employ a real estate broker to sell various real properties that were included in Jacobsen's estate. Jacobsen objected to the motion, expressing concern that listing the properties for sale would cause the tenants, who were producing rental income for Jacobsen and his wife, to move out of the homes.  Jacobsen also argued that the sale of the Tice Valley House would be sufficient to pay all of his debts and, therefore, that no other properties needed to be sold.  This argument obviously conflicted with Jacobsen's prior testimony and Malikyar's position in Adversary No. 07-4134 that the Tice Valley Property was her sole and separate property.  The Court granted the Chapter 7 trustee's motion to employ a real estate broker at the conclusion of a hearing on May 13, 2008.

On March 27, 2008 – the same day the Chapter 7 trustee filed a motion to employ a broker to sell Jacobsen's properties – Coast Capital filed a document entitled

14

"Substitution of Trustee" in the real property records for the Tice Valley Property. The notice stated that Gregorio Alvizuri Ramirez had accepted the appointment as trustee and successor trustee under the Deed of Trust.

On May 28, 2008, Coast Capital filed a "Notice of Trustee's Sale" in the real property records for the Tice Valley Property. The document was purportedly signed by Gregorio Alvizuri Ramirez. The document stated that on June 23, 2008, Ramirez intended to sell the property at the courthouse steps located at 725 Court Street in Martinez, California, for the balance owed to Coast Capital, to wit: $200,093.21. The Chapter 7 trustee attempted to serve Ramirez with an adversary complaint at the sale, but Ramirez was not present. Rather, Ruben Avalos was at the courthouse that day attempting to sell various properties. Ruben Avalos was not associated with Coast Capital in any way and was not attempting to sell the Tice Valley Property.

*2. The Chapter 7 trustee's motion to sell the Tice Valley Property*

a. Jacobsen and Malikyar oppose the motion

On June 18, 2008, the Chapter 7 trustee filed a motion to sell the Tice Valley Property. The Chapter 7 trustee stated in the motion that, after an investigation, he had determined that the Tice Valley Property was encumbered by four liens: (1) GreenPoint asserted the first lien in the approximate amount of $760,000 - $770,000; (2) Wells Fargo Mortgage asserted a lien for $250,000 and Wells Fargo Bank, N.A. asserted a lien of $14,000.00 (collectively, "Wells Fargo"); (3) the Srameks had filed lis pendens against the Tice Valley Property; and (4) Coast Capital asserted a lien against the Property in the approximate amount of $195,000. The Chapter 7 trustee stated that Srameks had agreed to release their lien in order to allow the sale to go forward. The Chapter 7 trustee also

disclosed that Wells Fargo (whose actual claim amount did not correspond to the amount listed in Jacobsen's bankruptcy schedules) had indicated that it would accept a total amount of $10,000 in complete satisfaction of any and all liens against the property.

The Chapter 7 trustee proposed to sell the Tice Valley Property to the tenants who had been renting the property for $1,000,000. The Chapter 7 trustee stated that the proposed sales price exceeded the most recent appraisal. The Chapter 7 trustee requested authority to hold $195,000 of the sales proceeds relating to the lien asserted by Coast Capital's pending the Court's resolution of Adversary No. 07-4134.

The Court scheduled hearing on the Chapter 7 trustee's motion to sell the Tice Valley Property for July 16, 2008. Jacobsen and Malikyar, who were both represented by Joyce Lindauer, filed separate objections on July 5, 2008. Jacobsen and Malikyar argued that the motion should be denied because the issue of whether the Tice Valley Property was property of the bankruptcy estate was the subject of a pending adversary proceeding. Malikyar additionally raised numerous procedural objections based on her contention that she is the owner of the Tice Valley Property.

Malikyar testified for the first and only time at the hearing on July 16, 2008. In her direct testimony, Malikyar stated that the right price for the sale of the Tice Valley Property is "what my husband says." On cross-examination, Malikyar did not understand the term "note," could not answer questions regarding brokerage fees or settlement costs, and could not recall when she had last made a payment to the lenders with secured interests in the Tice Valley Property. As previously discussed, Malikyar testified on cross-examination that she does not know much about real estate and that her husband

16

helps her with "all those things." She specifically testified that she has followed her husband's "legal advice" regarding the sale of the Tice Valley Property.

### b. Jacobsen contacts Laurie Share

At or around the time the Chapter 7 trustee filed his motion to sell the Tice Valley Property, Jacobsen contacted Laurie Share. Share had purchased some or all of the Lake Tahoe lots several months before through one of her companies, South Shore Capital, Inc. ("South Shore"), as previously discussed. According to Share's testimony, Jacobsen suggested that she could purchase Coast Capital's lien on the Tice Valley Property for a very low price.[13] At the show cause hearing, Jacobsen testified that he had received a letter from Coast Capital indicating that it was going out of business and was looking to liquidate its assets. Jacobsen did not produce this letter or any documentary evidence supporting his testimony regarding his purported contacts with Coast Capital. The Court finds that Jacobsen's testimony regarding the receipt of a "going out of business" letter from Coast Capital was not credible.

At the show cause hearing, Share testified that she had been investing in real estate for approximately 25 years and that she owned 20 properties. Jacobsen and Share testified that they had known each other for several years. Neither Jacobsen nor Share could recall the date of their initial conversation regarding the Tice Valley Property.

Jacobsen and Share both testified at the show cause hearing that Jacobsen supplied Share with contact information for Coast Capital, including a physical address and a web site address. Despite her alleged experience as a real estate investor, Share did

---

[13] Jacobsen testified that he did not notify his wife of this opportunity because she did not have the funds to take advantage of it. At or around this time, however, Jacobsen offered the Chapter 7 trustee $2,000 to purchase his interest in the pending wiretapping suit against the Srameks. The Chapter 7 trustee filed a motion to sell Jacobsen's interest in the suit to Jacobsen for $2,000 on April 11, 2008. The motion was approved, and Jacobsen and Malikyar proceeded with the wiretapping suit in federal district court.

not do any due diligence with respect to the Tice Valley Property (such as a title or a lien search).   Share relied upon Jacobsen's assessment as to the value of the Tice Valley Property as well as Jacobsen's representation that Coast Capital's lien was third in priority.   Although Share was aware that the Tice Valley Property was involved in a bankruptcy proceeding, she did not review the record of this case or make any inquiry to the Chapter 7 trustee regarding its status.

According to Share, she sent a letter to Coast Capital offering to purchase its lien on the Tice Valley Property for $10,000.   Share further testified that a representative of Coast Capital accepted her offer.   Share testified that her communications with Coast Capital occurred via the company's website, which is no longer in existence, and that she did not keep copies of the messages she exchanged.   Share submitted documentary evidence establishing that she transferred $10,000 from one of her bank accounts to Belize Bank International, Ltd., "FFC Coast Capital Ltd.," on or about June 24, 2008. Share testified that she did not receive and does not have a copy of the original promissory note allegedly executed by Malikyar in favor of Coast Capital.

On June 25, 2008, a document entitled "Assignment of Deed of Trust" was filed in the real property records for the Tice Valley Property.   The document was purportedly executed by Gregorio Alvizuri Ramirez, as president of Coast Capital, and states that Coast Capital had agreed to assign its interest in the Tice Valley Property to South Shore. Share is the owner and sole officer of South Shore, which she formed under California law in April 2008 in connection with her purchase of the lots in Lake Tahoe.

Ramirez also purported to notarize the "Assignment of Deed of Trust," placing his signature in the place reserved for Alexander Richards, US Consular Agent for

18

Acapulco, Guerrero, Mexico.  Ramirez also purported to sign an "Agreement to Sell Note" to Laurie Share dated July 1, 2008.  A "corrected" assignment was later created which attached a new (and apparently genuine) signature of a US Consular Agent for Ixtepa, Guerro, Mexico.  However, in light of the obvious forgery contained within the original "Assignment of Deed of Trust," which was apparent even to Share at trial, the Court places no weight on the dates contained in the documents purporting to sell and assign Coast Capital's lien on the Tice Valley Property to South Shore.[14]

c. <u>South Shore contacts an attorney</u>

On Monday, July 14, 2008, South Shore attempted to contact Gregory Meyer, a Texas attorney, to arrange for him to represent South Shore at a hearing in this Court on Wednesday, July 16, 2008.  Since Meyer was out of the office, South Shore's representative spoke with Meyer's partner.  Meyer's partner later informed him that Jack Robertson, an attorney, was trying to reach him about a possible representation in bankruptcy hearing and that Robertson could not be reached immediately because he was on his way to court.  Meyer testified, credibly, that an individual representing himself to be Jack Robertson called Meyer again later that day and informed Meyer that he represented South Shore and was looking for local counsel in connection with Jacobsen's bankruptcy.  Robertson expressed his concern was that the Chapter 7 trustee was trying to sell the Tice Valley Property for too little, and he represented to Meyer that South Shore was in a third lien position.

---

[14] The original notarization bears the same date and appears identical to the notarization attached to the "Substitution of Trustee" filed on March 27, 2008 in the real property records relating to the Tice Valley Property.

That afternoon or evening, Meyer looked at the docket sheet for this case and researched the liens that had been filed against the Tice Valley Property. He formed the opinion that South Shore was in a second lien position.

The next morning, Meyer had a court appearance and mediation scheduled in downtown Dallas in an unrelated matter. Since his office is located far north of Dallas, Meyer drove directly from his home in Carrolton, Texas, to downtown Dallas. Share's telephone records reflect that she called Meyer's office at 10:23 a.m. on July 15, 2008. The call lasted approximately two minutes. Meyer testified, credibly, at the show cause hearing that he was participating in the scheduled mediation with another client at 10:23 a.m. that morning.

Since Meyer was not in his office and did not have a secretary, Share's call was transferred to Meyer's voice mail. Share left a brief message expressing concern about the lateness of the hour and the need to prepare for the hearing in this Court on July 16, 2008. Meyer testified, credibly, that Share left a phone number for "Jack Robertson" and instructed Meyer to call Robertson in order to prepare an objection to the Chapter 7 trustee's motion to sell the Tice Valley Property. Jacobsen and Share's testimony that Meyer participated in an unscheduled conference call with them from his office at 10:23 a.m. was not credible, nor was it logistically possible for such a conference to occur.

Meyer returned to his office between 2:30 - 3:00 p.m. on July 15, 2008. As was his custom, the first thing he did was check his voice mail for messages. He listened to Share's message and shortly thereafter called the number she had left. He asked for Jack Robertson, and the person answering the phone did not dispute that he was Jack Robertson. They discussed the representation of South Shore at the sale hearing, and

Meyer told Robertson that he would prepare a fee agreement for the limited purpose of appearing at the sale hearing. He asked for a phone number for Share so that he could speak with Share directly but was told that the best way to communicate with her was via e-mail. The individual representing himself to be Robertson provided Meyer with an e-mail address for Share, and Meyer used that address to send her a fee and retainer agreement as well as payment instructions.

Due to the lateness of the hour, Meyer filed an objection to the proposed sale of the Tice Valley Property for South Shore prior to receiving a signed fee and retainer agreement from Share. South Shore asserted in the objection that it had received an assignment from Coast Capital of its secured interest in the Tice Valley Property. South Shore attached a copy of the document entitled "Assignment of Deed of Trust" to its objection. Meyer testified that he had received this document from Share as an attachment to an e-mail.

At some point that afternoon, after talking with Robertson, Meyer checked his e-mail on his computer. He discovered a message from Share in which she provided him with a different telephone number for Jack Robertson. Since he had already spoken with Jack Robertson after checking his voice mail that morning, Meyer did not call the new number.

Meyer did not receive a signed fee or retainer agreement from Share. Meyer sent Share an e-mail explaining that he wouldn't represent her at the hearing without a signed agreement. Share did not respond, and Meyer did not appear at the hearing on July 16, 2008. Meyer subsequently filed a motion seeking to withdraw as counsel for South Shore, which the Court granted.

21

At the conclusion of the hearing of the Chapter 7 trustee's motion to sell the Tice Valley Property, which Meyer did not attend, the Court denied the Chapter 7 trustee's motion because, among other things, a creditor with a significant lien on the property was objecting to the sale, and Jacobsen's interest in the Tice Valley Property was disputed and was the subject of Adversary Proceeding No. 07-4134.  At the suggestion of the parties, the Court scheduled Adversary Proceeding No. 07-4134 for a management conference to be conducted on July 22, 2008.  The Court instructed counsel for the Chapter 7 trustee to notify South Shore of the time and place of the management conference.

Counsel for the Chapter 7 trustee, Larry Levick, dutifully called Meyer.  Meyer explained that he was withdrawing as counsel for South Shore and provided Levick with the telephone number he had used to contact Robertson.  Levick called the number he had obtained from Meyer.  Robert Jacobsen, not Jack Robertson, answered the telephone by stating "this is Robert Jacobsen" or "Robert Jacobsen speaking."  Levick at first assumed that he must have received the wrong number from Meyer, and so apologized to Jacobsen and called Meyer again.  Meyer gave Levick the second telephone number he had received from Share for Jack Robertson via e-mail.  Levick called the second number, but no one answered, and he was unable to leave a message because a voice mail box had not been established for that telephone number.

Share contacted the Chapter 7 trustee's office at some point after the hearing on July 16, 2008.  The Chapter 7 trustee asked Levick to return her call.  Levick obtained her telephone number and dutifully called Share on July 21, 2008.  Levick informed her of the management conference scheduled for the next day, and he told her what had

22

happened when he tried to reach Jack Robertson at the telephone number Meyer had used. Levick asked Share if she knew how he could get in touch with South Shore's attorney, Jack Robertson.

Levick testified, credibly, that Share informed him that Jack Robertson was an employee who had to be let go because he failed a background check. Levick testified, credibly, that Share told him that she had let Jack Robertson go within the past day or so and did not have a phone number or address for him. Levick asked Share to explain how she had done a background check without an address or a phone number for Jack Robertson, but Share had no response.

At the show cause hearing, Share testified that she owns, among other properties, a residential hotel for people whose lives are in transition, such as construction workers. She testified that she met Jack Robertson at her transient hotel where he was visiting a group of guests. She testified that she met him at the beginning of the second week of July 2008 and that he told her he was looking for temporary work. According to Share's testimony at the show cause hearing, Jack Robertson told her that he had administrative experience and had worked for a lawyer or paralegal in the past. Share testified at the show cause hearing that she did not do a background check on Jack Robertson and had not intended to permanently hire him. She testified that she had agreed to pay him $12.00 an hour for his administrative services.

Share testified that Jack Robertson called Meyer for her regarding the motion to sell the Tice Valley Property and made other calls on her behalf, such as requests for services and information relating to her properties. Share testified that she inadvertently provided Meyer with Robert Jacobsen's telephone number instead of Jack Robertson's

telephone number in her voice mail message on July 14, 2008. According to Share's testimony at the show cause hearing, not only do Robert Jacobsen and Jack Robertson have very similar names, but their telephone numbers are similar as well. Share also testified at the show cause hearing that Jack Robertson disappeared immediately after his telephone conversations with Meyer.

The only evidence that Jack Robertson exists is Share's testimony. The Court, however, did not find Share's testimony regarding her employment of an individual named Jack Robertson to be credible. The Court finds, instead, that Share and Jacobsen were involved in a scheme to allow Jacobsen to improperly obstruct the sale of the Tice Valley Property. The Court finds that Meyer was in fact speaking with Robert Jacobsen regarding South Shore's objection to the motion to sell the Tice Valley Property.

Meyer appeared at the management conference on July 22, 2008, not as counsel for South Shore, but as an officer of this Court.[15] Meyer expressed his concern that he had been used to deceive the Court in some way. The Court subsequently issued an Order to Show Cause requiring Robert Jacobsen, Laurie Share, Jack Robertson and South Shore to appear and show cause why they have not acted in bad faith or with reckless disregard of their duties to this Court, why 28 U.S.C. § 1927 has not been violated, or why Federal Rule of Bankruptcy Procedure 9011(b)(1) and (3) have not been violated.

---

[15] At the show cause hearing, Share took the position that Meyer had violated South Shore's attorney-client privilege. Meyer's communication to Levick of what he believed to be the contact information for South Shore's counsel does not appear to this Court to be privileged information. Share testified freely at the show cause hearing regarding her contacts and conversations with Meyer. Moreover, any privilege appears to have been waived inasmuch as, according to Share's testimony at the show cause hearing, Robert Jacobsen participated in the alleged conference call between herself, as the owner of South Shore, and Greg Meyer on the morning of July 16, 2008. The Court also notes that the attorney-client privilege is subject to a "crime-fraud" exception. *See, e.g., U.S. v. Zolin,* 491 U.S. 554 (1989).

24

# ANALYSIS

As an initial matter, the Court finds and concludes that South Shore did not retain an attorney named Jack Robertson.  Indeed, as previously discussed, Jack Robertson was in fact Robert Jacobsen.  Robert Jacobsen is not an attorney.  The Court, therefore, need not address whether sanctions are appropriate under 28 U.S.C. § 1927, which applies only to an "attorney or other person admitted to conduct cases in any court of the United States."[16]  *See Matta v. May*, 118 F.3d 410, 413-14 (5th Cir. 1997) ("[Section] 1927 sanctions are, by the section's plain terms, imposed only on offending attorneys; clients may not be ordered to pay such awards. *Travelers Ins. Co. v. St. Jude Hospital,* 38 F.3d 1414, 1416 (5th Cir. 1994)).

This Court has the inherent power to impose sanctions under appropriate circumstances.  *See, e.g., Chambers v. NASCO,* 501 U.S. 32 (1991); *In re Yorkshire LLC,* 540 F.3d 328 (5th Cir. 2008).  This Court also may impose civil sanctions pursuant to § 105(a) of the Bankruptcy Code, which authorizes the issuance of any order necessary or appropriate to carry out the provisions of the Bankruptcy Code.[17]  One of the primary functions of § 105(a) is to "prevent an abuse of process."  11 U.S.C. §105(a).  The Restatement (Second) of Torts defines "abuse of process" as "[o]ne who uses a legal

---

[16] There is a split among jurisdictions as to whether a pro se litigant is a "person admitted to conduct cases" under § 1927.  *Compare Sassower v. Field,* 973 F.2d 75, 80 (2d Cir.1992) (stating that Congress did not intend the phrase "other person" to apply to pro se litigants) *with Wages v. Internal Revenue Serv.,* 915 F.2d 1230, 1235-36 (9th Cir. 1990) ("[s]ection 1927 sanctions may be imposed upon a pro se plaintiff").  The Fifth Circuit has yet to resolve this issue.

[17] Section 105(a) provides that:

> The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." RESTATEMENT (SECOND) OF TORTS § 682 (1977).

Where there is sufficient evidence to find an abuse of the judicial system, civil sanctions may be awarded against represented parties and without regard to the signed document requirement of Bankruptcy Rule 9011. *See, e.g., In re Mergenthaler,* 144 B.R. 632, 635 (Bankr. E.D. N.Y. 1992) (citing *United States v. Int'l Brotherhood of Teamsters,* 948 F.2d 1338, 1345 (2nd Cir. 1991)); *Byrne v. Nezhat,* 261 F.3d 1075, 1117-18 (11th Cir. 2001) (explaining the imposition of sanctions against a represented party is "proper if she knew or should have known that the allegations in the complaint were frivolous."). The Supreme Court recently determined that bankruptcy courts have "broad authority ... to take *any action that is necessary or appropriate* 'to prevent an abuse of process' described in § 105 of the Code." *In re Marrama,* 549 U.S. 365, 375 (2007) (emphasis added).

In order for the Court to impose sanctions pursuant to § 105(a) or its inherent power, it must make "a specific finding of bad faith." *Goldin v. Bartholow,* 166 F.3d 710, 722 (5th Cir. 1999); *Crowe v. Smith,* 261 F.3d 558, 563 (5th Cir. 2001); *Bynum v. Am. Airlines, Inc.,* 166 Fed.Appx. 730, 735 (5th Cir. 2006) (citing *Chambers,* 501 U.S. at 44-46) ("One aspect of this inherent power is the power to impose sanctions, including attorney's fees, on litigants for conduct that is in bad faith, vexatious, wanton or undertaken for oppressive reasons."); *Matta v. May,* 118 F.3d 410, 416 (5th Cir. 1997); *Matter of Volpert,* 110 F.3d 494, 500 (7th Cir. 1997). "Bad faith, for the purposes of § 105 is characterized as an attempt to abuse the judicial process." *In re Gorshtein,* 285

26

B.R. 118, 124 (Bankr. S.D. N.Y. 2002) (citing *In re Spectee Group, Inc.,* 185 B.R. 146, 155 (Bankr. S.D. N.Y. 1995)).  Moreover, the threshold for imposing sanctions using the Court's inherent powers is extremely high.  The Court should invoke its inherent powers if it finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled." *Chambers,* 501 U.S. at 46.

Here, South Shore filed an objection to the Chapter 7 trustee's motion to sell the Tice Valley Property.  South Shore was at that time represented by Meyer, who was contacted by South Shore on the eve of the scheduled hearing.  Meyer relied upon the documents provided by Share, the information he received from "Jack Robertson," and his own review of the docket of the case in filing the objection for South Shore.

At the show cause hearing, Share did not testify that Meyer had transposed Jacobsen's name and that Jack Robertson never existed.  Such testimony might have provided a reasonable alternative explanation of South Shore's contacts with Meyer.  Share, instead, spun an elaborate tale of a transient individual with a name and telephone number remarkably similar to that of Robert Jacobsen who abruptly disappeared after speaking with Meyer.  Share's testimony about Jack Robertson was not credible.  Moreover, Share's testimony that she, Meyer and Jacobsen had a conference call on the morning of July 15, 2008 was not credible.

The Court finds, as a matter of fact, that Jacobsen and Share misled Meyer as to the identity of "Jack Robertson."  Moreover, Share failed to conduct an independent investigation of the grounds for the objection to the Chapter 7 trustee's motion to sell the Tice Valley Property.  Share testified falsely at the show cause hearing when she denied that she had instructed or allowed Jacobsen to contact Meyer.

Jacobsen, not Jack Robertson, helped Meyer craft an objection to the Chapter 7 trustee's motion to sell the Tice Valley Property on behalf of South Shore. Jacobsen did so with Share's full knowledge and consent. Jacobsen and Share, however, deliberately withheld Jacobsen's identity from Meyer. While it is not uncommon for parties to form alliances in bankruptcy cases, the manner in which Jacobsen and Share comported themselves is clearly indicative of their dishonest, fraudulent, and bad faith intent to obstruct the Chapter 7 trustee in his attempt to administer Jacobsen's estate.

The Court has rarely experienced a debtor who has gone to such lengths to oppose to the sale of a property that could satisfy a significant portion of his debts as Jacobsen. However, Jacobsen's unusual behavior was of a piece with his conduct in this case. He initially failed to disclose his wife's income and property because he and his wife were "separated," and the instructions for the bankruptcy schedules do not require disclosure of a spouse's income and assets if the spouses are separated and a joint petition is not filed. Although Jacobsen eventually amended his schedules and statements, he failed to disclose all of the information required by the Statement of Financial Affairs, such as bank accounts and transfers of property by Jacobsen or Malikyar (other than property transferred in the ordinary course of business) within two years of Jacobsen's bankruptcy, thereby frustrating the Chapter 7 trustee's ability to understand his pre-bankruptcy business transactions.[18] *See In re Chalik*, 748 F.2d 616, 617 (11th Cir. 1984) (holding that a debtor must make full disclosure even of seemingly worthless assets); *In re Beaubouef,* 966 F.2d 174, 177-78 (5th Cir. 1992) (quoting *Chalik*). Moreover, Jacobsen's testimony

---

[18] "The scheduling of interests in property, both real and personal, is a very important duty. The intentional and fraudulent omission of property from sworn schedules will amount to an offense punishable under the Criminal Code …." 4 COLLIER ON BANKRUPTCY ¶ 521.06[b]. *See also* 18 U.S.C. §152 (imposing criminal sanctions for concealment of assets and false oaths, among other things); *Payne v. Wood,* 775 F.2d 202, 205 (7th Cir.1985) ('[T]he operation of the bankruptcy system depends on honest reporting').

before this Court has been riddled with convenient memory lapses and misrepresentations of Malikyar as a sophisticated business woman.

From what the Court has gathered, it appears that Jacobsen treated his wife as a strawman inasmuch as he placed title to properties in her name in order to hide those assets from creditors, thereby shielding those properties from any personal liability of his own.  Although Jacobsen and Malikyar claim to have entered into legally binding pre- and post-nuptial agreements, Jacobsen did not, in fact, distinguish Malikyar's allegedly separate property from his own.  The money to purchase the Tice Valley Property came from him, he exercised control over and "managed" all of the properties titled in his wife's name, he alone understood many of the transactions relating to these properties, and his wife did whatever he instructed her to do.  Indeed, in Adversary Proceeding No. 07-4124, Jacobsen and Malikyar ultimately agreed that the Tice Valley Property, among others, was equal or joint management community property.[19]

The appearance of South Shore in this case had the beneficial effect, from Jacobsen's point of view, of deflecting attention from Coast Capital.  Coast Capital has never appeared in this Court and there is little evidence that it ever existed aside from the documents filed in its name in the real property records for the Tice Valley Property.  Coast Capital's absence from the evidentiary record is especially troubling in light of the fact that no one other than Jacobsen seems to have ever met or dealt with its representatives except, allegedly, via electronic mail.  Moreover, the original documents

---

[19] The Court entered an Agreed Final Judgment in Adversary Proceeding No. 07-4134 on November 3, 2008.  Prior to the entry of the Agreed Final Judgment, Jacobsen filed a motion in the main bankruptcy case seeking to compel the Chapter 7 trustee to abandon several of the properties.  The hearing on the motion to compel abandonment was continued several times.  The parties ultimately reached an agreement, and the Court entered an Agreed Order on Motion to Require Trustee to Abandon Real Property in the main bankruptcy case on February 17, 2009.

purporting to assign Coast Capital's lien on the Tice Valley Property to South Shore contained an obvious forgery of the notary's signature. Although Share initially denied the forgery in her testimony at the show cause hearing, she admitted the forgery upon further questioning and recalled that the original assignment was amended in order to correct the notary's signature.

Share, the sole owner and officer of South Shore, failed to conduct a reasonable investigation into the factual basis of the objection to the Chapter 7 trustee's motion to sell the Tice Valley Property. Share conspired with Jacobsen to deceive Meyer, and she willingly allowed Jacobsen to use South Shore to obstruct the proposed sale. Jacobsen and Share caused South Shore's unfounded objection to the Chapter 7 trustee's motion to be filed for an improper purpose. *See* FED. R. BANKR. P. 9011(b)(1) and (3). Although the Court did not hear the objection and denied the Chapter 7 trustee's motion for reasons that were unrelated to South Shore's objection, the standard for determining whether a litigant should be sanctioned under the Court's inherent power or § 105(a) is not "no harm, no foul." The issue is whether Jacobsen, Share or South Shore acted in bad faith or fraudulently. The Court finds and concludes that the evidence clearly establishes that Jacobsen, Share and South Shore acted in bad faith, attempted to defraud this Court, falsified documents presented to this court, caused materially false pleadings to be filed with this Court, and have abused the bankruptcy process.

## CONCLUSION

For all of the foregoing reasons, the Court concludes that sanctions against Jacobsen, Share and South Shore are appropriate under § 105(a) of the Bankruptcy Code. The Court further concludes that an award of attorneys' fees and costs is appropriate and

that a case may be made that Jacobsen's discharge should be denied under § 727(a)(2), (a)(3), (a)(4)(A), or (a)(4)(B).    The Court will enter an order scheduling a separate hearing to determine the amount of attorneys' fees and costs to be awarded against Jacobsen, Share, and South Shore and to give Jacobsen an opportunity to be heard on whether to deny his discharge based on the conduct discussed in this Memorandum Opinion.[20]

Signed on 9/30/2009

*Brenda T. Rhoades*    SR
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

---

[20] Although this case was filed in 2007, Jacobsen has not yet received a discharge.  The Sramaks filed an adversary proceeding, which is denominated Adversary Proceeding No. 08-3038, objecting to Jacobsen's discharge.  The Sramaks' claims are currently set for trial in 2010.

31